**CERTAINTEED CORPORATION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

**No. 81–7251.**

United States Court of Appeals, Eleventh Circuit.

Aug. 24, 1983.

1044

Constangy, Brooks & Smith, Alan L. Rolnick, Lovic A. Brooks, III, Atlanta, Ga., for petitioner, cross-respondent.

Elliott Moore, Deputy Asst. General Counsel, N.L.R.B., Helen L. Morgan, Washington, D.C., for respondent, cross-petitioner.

Tomar, Parks, Seliger, Simonoff & Adourian, Robert F. O'Brien, Haddonfield, N.J., for intervener Glass Bottle Blowers Assoc. of the U.S. and Canada, AFL–CIO.

Before TJOFLAT and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Certainteed Corporation (the Company) petitions the court to review an order of the National Labor Relations Board (the Board) finding that it committed unfair labor practices in refusing to bargain with a certified union in violation of sections 8(a)(1) and 8(a)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 158(a)(1) and (5) (1976), and the Board cross-petitions for enforcement. The Glass Bottle Blowers Association of the United States and Canada (the Union) has intervened in the proceeding. As a defense to the refusal to bargain charges, the company challenges the validity of the underlying representation proceeding and the refusal of the Board to grant a hearing on three of the four objections to that election proceeding which it presents to us for review.[1]

---

1. Representation proceedings are not directly reviewable by the courts, *American Federation of Labor v. NLRB,* 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). The fairness of elections may only be challenged by refusing to bargain with the victorious union and then contesting the election's validity in the unfair labor prac-

The Company urges that last-minute union misrepresentations of fact impaired employee free choice (objection 1); that threats created an atmosphere of coercion and fear that prevented employee free choice (objection 2); that several improper acts by the union and its supporters combined with rumors in the plant to create an impression that the union would pay employees to vote for it (objection 3); and that electioneering at or near the polling place destroyed the "laboratory conditions" the Board requires in its election proceedings (objection 4).

We sustain the Board's findings that objections 2, 3 and 4 lack merit, but remand objection 1 to the Board for the limited purpose of determining the retroactivity *vel non* of an intervening change in the standard governing misrepresentation objections. We consider these objections in turn.[2]

Pursuant to a stipulation, an election was held at the Company's Athens, Georgia, plant on February 15 and 16, 1979. The union won by a margin of 180 votes to 144. The Company timely filed five objections to the conduct of the election. The Regional Director (RD) recommended, after an *ex parte* investigation, that these objections be dismissed in their entirety. The Company excepted to this recommendation, and urged the Board to hold a hearing on its objections. The Board, in an unpublished decision, adopted the RD's recommendation that objections 1, 2, 4 and 5 be overruled without a hearing, but directed that a hearing be held on objection 3—that the union granted benefits to voters, or created the appearance that benefits would be granted to those supporting it—and on a sixth objection which developed in the course of the RD's *ex parte* investigation. After a hearing, the Hearing Officer recommended that these objections be overruled. The Board

subsequently adopted these recommendations and certified the union. The Company refused to bargain in order to obtain judicial review of the election certification, and maintains that objections 1–4 require that the election be set aside. It also argues that a hearing is required to resolve factual disputes pertaining to objections 1, 2 and 4.[3]

### I. Misrepresentations

■ In objection 1, the Company asserts that the Union mailed three letters to the employees during the week before the election that materially understated the wage increases given by the Company to its employees during 1978, and overstated the increases that the union won for Certainteed employees in New Jersey and Owens-Corning employees in Texas. At the time the Board reviewed this objection, it applied the standard first articulated in *Hollywood Ceramics Co.*, 140 NLRB 221, 224 (1962) (footnote omitted), and subsequently reaffirmed in *General Knit of California, Inc.*, 239 NLRB 619, 620 (1978) (footnote omitted):

> [A]n election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election.

During the pendency of this appeal, the Board decided to abandon the *Hollywood Ceramics-General Knit* test for misrepresentation objections, and return to the approach taken in *Shopping Kart Food Market, Inc.*, 228 NLRB 1311 (1977). In accordance with *Shopping Kart*—a case overruled 20 months later by *General Knit*—the Board held in *Midland National Life Insur-*

---

tice proceedings. *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 28 (5th Cir.1969).

**2.** We recognize our responsibility to assess the cumulative effect of these allegations on the validity of the proceedings. *See Home Town Foods, Inc. v. NLRB,* 416 F.2d 392, 399 (5th Cir.1969). However, our finding that only ob-

jection 1 may have substantial merit disposes of any purported cumulative impact of the four objections.

**3.** The company does not press objection 5 as an independent basis for setting aside the election, and abandons objection 6. Therefore, they are not before us for review.

ance Co., 263 NLRB No. 24, 110 LRRM 1489, 1494 (1982), that it would no longer probe into the truth or falsity of the parties' campaign statements, and that it would no longer set aside elections on the basis of misleading campaign statements. Henceforth, the Board will intervene in only two cases: (1) "where a party has used forged documents which render the voters unable to recognize propaganda for what it is," id. (footnote omitted); and (2) "when an official Board document has been altered in such a way as to indicate an endorsement by the Board of a party to the election." Id. at —— n. 25, 110 LRRM at 1494 n. 25 (citation omitted). Thus, the Board will no longer overturn elections based on the substance of the parties' representations, but only because of the deceptive manner in which the representations were made. Id.[4]

If the union representations at issue did not breach the Hollywood Ceramics-General Knit standard, it would not be necessary to consider the issues raised by the Board's decision to utilize the less restrictive standards established in Shopping Kart.[5] However, careful review of the record in this case indicates that the RD, and the Board, erred in overruling objection 1 without holding a hearing under the Hollywood Ceramics-General Knit standard. It is clear, though, that since the misrepresentations involve neither forged documents nor altered Board documents, the Board would not set aside this election based on these misrepresentations if it applied the Shopping Kart-Midland rule.[6] Therefore, we must determine the applicability of the Midland decision to this appeal. We first analyze the objection under the more stringent Hollywood Ceramics standard, and then reach the issues presented by the Board's decision in Midland.

■ Initially, the parties wage a fierce battle over the appropriate standard for our review of the Board's disposition of the election objections. It is true that

[o]ur standard of review is based upon the recognition that Congress has entrusted broad discretion to the Board to conduct and supervise employee elections. The specialized functions of the Board, such as classification of employees and the identification of an unacceptable degree of interference with free choice in union elections, require a quality and degree of expertise uniquely within the domain of the Board.

NLRB v. Klingler Electric Corp., 656 F.2d 76, 85 (5th Cir. Unit A 1981).[7] It is also true that "no area is more within the expertise of the Board than the proper limits of campaign propaganda and the impact of employer and union statements upon the employees' exercise of free choice." NLRB v. Golden Age Beverage Co., 415 F.2d 26, 30 (5th Cir.1969).

However, our standard of review hinges fundamentally on the underlying nature of the Board's determination with respect to each election objection and the manner in which it has made that determination. The Board disposed of the company's misrepresentation objection without holding a hearing thereon, thus ruling that it did not raise "substantial and material factual issues." 29 C.F.R. § 102.69(d) (1982) (requiring a hearing whenever the RD concludes that an objection raises such issues). We have held that due process requires the Board to grant a losing party a post-election hearing

---

**4.** The Midland rule applies only to misrepresentations: the Board will continue to scrutinize other campaign misconduct involving threats, promises, etc. 263 NLRB at ——, 110 LRRM at 1494.

**5.** This was the former Fifth Circuit's practice when the Board last switched, in 1977, from the Hollywood Ceramics to the Shopping Kart standard. See, e.g., NLRB v. Wagner Elec. Corp., 586 F.2d 1074, 1077 n. 5 (5th Cir.1978); NLRB v. J.C. Penney Co., 559 F.2d 373, 377 (5th Cir.1977).

**6.** Petitioner does not contest this point in its supplemental brief, filed at the request of the court, to discuss the impact of Midland on this case.

**7.** In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as precedent the decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981.

when it supplies prima facie evidence raising substantial and material issues that would warrant setting the election aside. *NLRB v. Claxton Manufacturing Co., Inc.,* 613 F.2d 1364, 1365 (5th Cir.1980), *modified* 618 F.2d 396.

■ The losing party to an NLRB election must sustain a heavy burden of proof in order to gain the right to an evidentiary hearing on its objections. It must come forward with " 'specific evidence of specific events from or about specific people ...'; conclusory allegations are not sufficient." *Claxton Manufacturing Co.,* 613 F.2d at 1366 (quoting *NLRB v. Douglas County Electric Membership Corp.,* 358 F.2d 125, 130 (5th Cir.1966)) (citations omitted). We have also required more than a mere showing of specific, objectionable activity: that activity must be shown to have had a material effect on employee free choice and the outcome of the election. *See id.; Golden Age,* 415 F.2d at 30.

■ An objecting party may not rely upon the Board to develop the evidence to make this showing, *see United States Rubber Company v. NLRB,* 373 F.2d 602, 606 (5th Cir.1967); however, once this showing has been made, the right to a hearing is established. It may not be denied on the basis of additional information developed by the RD in his ex parte investigation. *Claxton Manufacturing Co.,* 613 F.2d at 1366.[8] Notwithstanding the broad discretion the Board enjoys in conducting and supervising employee elections, it lacks discretion to deny a hearing to a losing party that supplies prima facie evidence raising substantial and material claims which, if ultimately proven true, would warrant setting the election aside. *Gulf Coast Automotive Warehouse Co. v. NLRB,* 588 F.2d 1096, 1098 (5th Cir.1979).

■ Thus, when the RD and the Board summarily dispose of election objections without holding a hearing, it must necessarily pretermit conflicting evidence, credit all the facts contended for by the objecting party, and hold as a matter of law that no ground has been shown which would warrant setting aside the election. *See NLRB v. Claxton Poultry Co.* 581 F.2d 1133, 1136 (5th Cir.1978) (no hearing required where RD rules as a matter of law that facts complained of do not warrant setting aside an election). Although certain Board determinations "as a matter of law" may deserve greater judicial deference because they rest upon general principles within the ambit of the Board's special expertise,[9] in general "[t]he determination of whether the [objecting party] raised a substantial and material factual issue requiring a hearing is 'a question of law and ultimately a question for the courts.' " *Luminator Division of Gulton Industries v. NLRB,* 469 F.2d 1371, 1374 (5th Cir.1972) (quoting *NLRB v. Bata Shoe Co.,* 377 F.2d 821, 826 (4th Cir.1967)). Our review of this decision is therefore independent, and the Board's findings merit no special deference. With this in mind, we turn to the company's objection that three union misrepresentations of fact during the final week of the campaign required that the election be set aside or, at least, that a hearing be held, if the *Hollywood Ceramics-General Knit* standard applies.

■ On February 8, 1979, one week before the election, the Union mailed a letter

---

**8.** The RD is required to make such an investigation if timely objections are filed to the conduct of the election or conduct affecting the result of the election. 29 C.F.R. § 102.69(c)(1) (1982). Under *Claxton,* the fruits of this required investigation may trigger a right to a hearing where the objecting party's initial showing fails to do so; however, as indicated, they can never deprive the objector of a hearing where its initial showing establishes the right to one.

**9.** For example, consistent with our recognition of the Board's special expertise in this area, see text at 1047–1048, *supra,* we have held that "[t]he substantiality or insubstantiality of likelihood that the voters' exercise of free choice has been affected is for the Board to decide, subject to review for abuse of discretion." *Claxton Poultry Co.,* 581 F.2d at 1136; *see Golden Age Beverage Co.,* 415 F.2d at 33. Thus, where the issue is the materiality of the misrepresentation—would it have had a substantial impact on the voters—the Board's decision will receive greater judicial deference.

to the employees stating, inter alia, that the company awarded a $.20 per hour raise last year. A second letter mailed February 9 discussed the wage increases negotiated by the Union at the Texas plant of Owens-Corning, a competitor of Certainteed's in the insulation manufacturing business. Finally, in a third letter, mailed February 13, the union reiterated its February 8 claim concerning the prior wage increase and enclosed for comparison purposes a table detailing the wage rates and wage increases offered by Certainteed to New Jersey employees represented by the union. The Company asserts that these letters materially understated the wage increases it gave to its Georgia employees and overstated those won by the union in New Jersey and Texas. It also maintains that, because it did not learn of the first two letters until February 13, and because of the specific production schedule it employs at the plant, it had inadequate time to reply effectively to these misrepresentations. The Company states that it could not reply at all to the letter mailed February 13, since it became aware of it only on February 15, the first day of the election.

This court employs a four-part test in analyzing misrepresentation objections under the Board's *Hollywood Ceramics-General Knit* standard:

> (i) whether there has been a misrepresentation of a material fact, (ii) whether the misrepresentation came from a party in an authoritative position to know the truth, or who had special knowledge of the facts, (iii) whether the other party in the election had adequate opportunity to reply and to correct the misrepresentation, and (iv) whether the employees had independent knowledge of the misrepre-

sented fact so that they could effectively evaluate the propaganda.

*Contract Knitter, Inc. v. NLRB,* 545 F.2d 967, 971 (5th Cir.1977) (citations omitted).

Rejecting Objection 1 without a hearing, the RD, affirmed by the Board, held that none of these letters, taken together with the supporting affidavits offered by the Company, stated a prima facie case under the *Contract Knitter* test. A review of the record indicates that the Board's dismissal of the objection based on the letter of February 8 was clear error.

Neither the Board nor the union disputes the Company's statement that in fact it gave two raises in 1978, totaling an average of $.46 per hour per employee. The RD assumed arguendo that the union had misrepresented the extent of the Company's wage increases but stated that (1) the Company was not prevented from responding by letter, handouts, or a notice on the employee bulletin board; and (2) that the employees would not be misled in any event, since most received the two 1978 wage increases.

The Board, in addition to these grounds adduced by the RD, now argues for the first time to this court that these misrepresentations were not material and that the union had no special knowledge of the wage increases granted by the Company. Although we find neither of these arguments persuasive in their own right,[10] we decline to consider them at this late date. The Board relied exclusively on the findings of the RD in rejecting the Company's request for a hearing on Objection 1. To dispose of Objection 1 now on grounds not relied upon by the agency below would be to accept appellate counsel's post hoc rationalizations for agency action, a procedure condemned by the Supreme Court in *NLRB v. Metro-*

---

10. This was the union's third attempt to organize this plant in four years, and the employees would have every reason to assume that the union would be quite familiar with the wage history of the employees. Concerning materiality, it is a truism that "[p]urportedly authoritative and truthful assertions concerning wages and pensions . . . are the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives to bargain." *NLRB v. Houston Chronicle*

*Publishing Co.,* 300 F.2d 273, 280 (5th Cir. 1962). It is an uncontested fact that two previous attempts to organize this plant by this same union in 1976 and 1977 failed by wide electoral margins. Record, vol. 3, at 332. Thus, hovering in the background of our analysis of the need for an evidentiary hearing is the absence of any explanation for this dramatic reversal in employee attitudes in a two-year period.

*politan Life Insurance Co.,* 380 U.S. 438, 444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965), as impairing the integrity of the administrative process. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

Turning to the RD's reasons for rejecting the misrepresentation objection based on the letter of February 8, we find no support whatsoever in the record for his assertion that the Company had adequate opportunity to reply, and the RD nowhere explains the basis for his conclusion. The only evidence in the record on this point is the uncontradicted affidavit of the plant manager that the Company did not learn of this letter until two days before the election and that 25% of the employees left work on February 9 and did not return to work until 11:00 p.m. the night before the election. Thus, the Company had less than 24 hours to reach 25% of its work force. This evidence creates substantial and material factual issues about the Company's capacity to reply effectively unless the RD can rule—as a matter of law and without regard to the surrounding circumstances—that two days will always suffice to rebut misrepresentations.

No Board decision of which we are aware adopts such a per se approach. Although it might be possible to promulgate a rule that in a certain type of work place, under certain conditions, two days will be presumed sufficient to reply to a misrepresentation, the Board has made no attempt to formulate such a standard, either in this or any other case. Instead, it has consistently used an individualized analysis of the circumstances of each case. *See, e.g., Western Health Facilities, Inc.,* 208 NLRB 56 (1974); *Western Electric Co.,* 172 NLRB 563 (1968); *Zarn, Inc.,* 170 NLRB 1135 (1968).

In this case, the Company's evidence indicated that it attempted to correct the misrepresentation, but was unable to do so under the time constraints imposed. The observation by the RD that the Company was not prevented from replying by letter, handouts, or a bulletin board notice does not address the central issue: did the Company have adequate time to reply effectively? *See Cross Baking Company v. NLRB,* 453 F.2d 1346, 1350 (1st Cir.1971) ("Adequate time to reply must mean adequate time to make an effective reply"). The fact that the Company attempted to rebut the misstatements does not prejudice its position that it had inadequate time to do so effectively. *Western Electric Co.,* 172 NLRB at 564.

*Luminator Division of Gulton Industries v. NLRB* dealt with a deceptive union claim that the company would give employees represented by the union in another plant a $.44 per hour raise in one year, when in fact the $.44 increase would be spread over a two-year period. We rejected the RD's claim that the Company had time to reply to this misrepresentation and remanded for a hearing, noting "[t]he Company's opportunity to reply to the misrepresentations within the twenty-six hours available certainly raised a question of material fact. . . ." 469 F.2d at 1374 (citations omitted). This case is indistinguishable: the Company has raised such a question about a concededly material representation and should have a hearing on its ability to reply, if we apply the *Hollywood Ceramics-General Knit* standard.[11]

The RD also rejected the objection based on the February 8 letter on the ground that the employees would not have been deceived by the Union statement since most had received the 1978 wage increases and were thus in a position to evaluate the

11. Cases such as *S.H. Lynch Co. v. NLRB,* 406 F.2d 766 (5th Cir.1968), *cert. denied,* 395 U.S. 907, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969), in which the court affirmed the Board's finding that two days was sufficient to rebut union wage misrepresentations, are distinguishable in that the record in that case, developed after an evidentiary hearing, amply supported such a finding. 406 F.2d at 767 & n. 1. The Board has also held that misrepresentations made two days before an election allowed "little or no time for an effective reply." *Lake Superior District Power Co.,* 239 NLRB 1275, 1276 (1979) (citation omitted). Here, the record is inadequate to permit any such inference.

union claim. Viewed in light of the evidence, this argument is pure sophistry. The only evidence before the RD was a statement by the plant manager that 46% of the employees were hired after the first of the two raises and therefore would have had no personal knowledge of the first increase. Thus, the evidence indicated that almost one-half of the employees would find the union claim quite plausible and would be unable to evaluate the misrepresentation. Although we agree as a general matter that "remarks on wage and health benefits which the employees themselves have received are particularly within the province of topics which they may independently evaluate and are, hence, of minimal significance," *El Monte Tool & Die Casting, Inc. v. NLRB,* 633 F.2d 160, 163 (9th Cir.1980) (citations omitted), we have not hesitated to depart from this general rule when employee hiring and turnover patterns indicate that they would not be in a position to evaluate the claims in question. *See Electra Manufacturing Co. v. NLRB,* 408 F.2d 570, 572–73 (5th Cir.1969) (where many employees were probationary and had been with the company less than 90 days, court would not assume familiarity with benefits). We are unwilling to speculate on the basis of the fragmentary record before us that there was sufficient time for the informed workers to correct the misapprehension created by the Union in the minds of those hired after the first wage increase. This is properly the subject-matter of an evidentiary hearing.[12]

Turning to the February 9 letter, the RD held that the Company failed to establish a prima facie case of a misrepresentation. This letter indicated that union-represented workers at an Owens-Corning plant in Texas gave up a bonus program for a base rate increase, added the cost-of-living increase

for the past three years to that increase, and then received a 10% increase on all that, which added up to a $1.58 per hour increase for the lowest rated job in the plant. The letter further stated that these increases went into effect immediately. The Company claims that its evidence showed that the lowest rated job in the Owens-Corning plant received a $.57 per hour increase, not $1.58, and that this misrepresentation was decisive for certain voters.

The RD held that the Company's evidence that the base rate increase was only $.57 per hour did not establish that the representations were untrue, and we agree. The letter indicates that *all* of the increases, of which the base wage increase was merely one component, added up to $1.58 per hour. The Company now argues that its evidence demonstrated that $1.01 of the $1.58 increase claimed by the Union was under a prior contract and that the new contract represented only a net increase of $.57 in hourly earnings. The evidence presented by the Company to the RD simply does not support this assertion, and it apparently declined an invitation by the RD to present additional evidence on this point.

The RD also found that the February 13 letter's characterization of the wage increases won by the Union for Certainteed workers in New Jersey contained no misrepresentation. The Company's complaint appears to be that the wage increases included cost-of-living increases and thus exaggerated the extent of the increases won. However, this information appears unmistakably at the foot of the table of wage rates containing the alleged misrepresentations. Although we have required a certain degree of precision in the discussion of obtainable wages and benefits, *NLRB v. Bill's*

---

**12.** We reject the Company's suggestion that the record supports a finding as a matter of law that it had no opportunity to reply effectively. We simply do not know enough about the conditions of this workplace and the nature of this campaign to make such a determination. The fact that the misrepresentation in the February 8 letter was repeated in the letter of February 13, a document mailed at such a time the Com-

pany had no opportunity to respond whatsoever, is not controlling. We have previously rejected the view that repetition of a prior misrepresentation requires that the objecting party have time for an additional response. *See Pepperell Manufacturing Co. v. NLRB,* 403 F.2d 520, 523 (5th Cir.1968), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969).

*Institutional Commissary Corp.,* 418 F.2d 405, 407 (5th Cir.1969) (New York wage scale deceptively represented as obtainable or in existence in New Orleans), the Union's presentation of the wage increases in this letter certainly provides sufficient precision. The RD's conclusion that the February 13 letter contained no misrepresentations is clearly correct; the Company cannot impose its preference on the Union as to how it presents truthful information, where no part of the message is unnecessarily obscure.

Having found that the misrepresentation contained in the February 8 letter requires an evidentiary hearing if the Board's *Hollywood Ceramics-General Knit* standard applies, we must determine the effect of the Board's return, during the pendency of the appeal before this court, to the *Shopping Kart* standard for misrepresentation objections. If we can apply the *Shopping Kart-Midland* standard to the misrepresentation at issue, the objection will be overruled and the need for a hearing obviated.

■■■■ The starting point for our analysis of the Board's changing views concerning misrepresentation objections is the Supreme Court's statement that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946) (citations omitted); *accord, NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969). Although the Board has much latitude in promulgating rules under the LMRA, when the Board, as here, is balancing conflicting legitimate interests, "[r]eviewing courts are not obliged to stand aside and rubber-stamp their affirmance of

administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province . . . ." *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). While we are not free to disturb the balance struck by the Board simply because we disagree with it, we are bound to determine if the Board's current resolution of the misrepresentation standard is arbitrary or contrary to law. *See Charles D. Bonnano Linen Service v. NLRB,* 454 U.S. 404, 412–413, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982).[13]

■■■■ The statute provides no guidance as to the standard the Board should use, if any, in evaluating campaign propaganda; it states only that collective bargaining representatives should be selected by majority rule in units appropriate for such purposes. 29 U.S.C. § 159(a) (1976). The Board has long held, and the courts have agreed, that "[a]n election can serve its true purpose only if the surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative." *General Shoe Corp.,* 77 NLRB 124, 126 (1948). The goal of the Board's standards governing elections, then, is the effectuation of employee free choice: "[t]he sole question facing us is how that 'fair and free choice' is best assured." *Midland National Life Insurance Co.,* 263 NLRB at ——, 110 LRRM at 1492.

■■■■ The Board cannot, in its choice of means to that end, arbitrarily single out certain misrepresentations that impair employee free choice and use those as a basis for overturning election results, while irrationally ignoring others that have the same effect. But no such argument can be made here: the Board has eliminated from its purview all misrepresentations except those

---

**13.** Thus, we cannot agree with the position that "[o]ur scope of review does not include focusing on policy formulations for which the Board has wide discretion but is limited to reviewing specific applications of the election standards chosen by the Board." *NLRB v. Mosey Manufacturing Co.,* 595 F.2d 375, 377 n. 5 (7th Cir. 1979) (citation omitted). The former Fifth Circuit stressed that "[t]he decision on which standard will best effectuate the Act *is* a determination to be made *initially* by the Board." *Home Town Foods, Inc. v. NLRB,* 416 F.2d at 399 n. 16 (first emphasis in original; second emphasis added). Its posture was one of deference, but not abstention.

involving forged documents or Board documents altered in such a way as to indicate Board endorsement of one of the parties to the election.[14] These latter misrepresentations differ from those excluded from Board review in two essential respects: (1) being tangible in nature, they are easily identified and evaluated; (2) concealing their true source, they make it difficult for employees to identify and evaluate as the propaganda of the party propounding them. Thus, a rule proscribing them will at once be easy to administer and be limited in its scope to statements inherently impossible to evaluate on their face. We cannot say that the Board's choice is arbitrary; we must determine, then, if its choice is consistent with the statutory design.

In *N.L.R.B. v. A.J. Tower Co.,* 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946), the Supreme Court upheld a Board rule barring post-election challenges to voter eligibility "even where it subsequently is ascertainable that some of the votes cast were in fact ineligible and that the result of the election might have been different had the truth previously been known." *Id.* at 333, 67 S.Ct. at 329. The Court deemed the rule "a justifiable and reasonable adjustment of the democratic process," *id.,* even if it acted to frustrate majority rule in a given case. We draw two lessons from *A.J. Tower:* (1) the Board, as an administrative agency, has general administrative concerns that transcend those of the litigants in a specific proceeding; and, (2) the Board can, indeed must, weigh these other interests in formulating its election standards designed to effectuate majority rule. In *A.J. Tower,* the Court recognized ballot secrecy, certainty and finality of election results, and minimizing dilatory claims as three such competing interests. We note that in the present case, the Board asserts the latter two factors as partial justification for its new rule.

The *Midland* Board summarized its reasons for finding the rule in *Shopping Kart* "the most appropriate accommodation of all the interests" involved as follows:

> Unlike its predecessor [the rule of *Hollywood Ceramics-General Knit*], it is a clear, realistic rule of easy application which lends itself to definite, predictable and speedy results. It removes impediments to free speech by permitting parties to speak without fear that inadvertent errors will provide the basis for endless delay or overturned elections, and promotes uniformity in national labor law by minimizing the basis for disagreement between the Board and the courts of appeals. Weighing the benefits flowing from reinstatement of the Shopping Kart rule against the possibility that some voters may be misled by erroneous campaign propaganda, a result that even Hollywood Ceramics permits, we find that the balance unquestionably falls in favor of implementing the standard set forth in Shopping Kart.

*Midland,* 263 NLRB at ——, 110 LRRM at 1493 (footnote omitted). The *Midland* Board, in assessing the value of the protection afforded employees by the *Hollywood Ceramics* rule, adhered to the view taken in *Shopping Kart,* 228 NLRB at 1313: "our fundamental disagreement with past Board regulation in this area lies in our unwillingness to embrace the completely unverified assumption that misleading campaign propaganda will interfere with employees' freedom of choice." *See Midland,* 263 NLRB at ——, 110 LRRM at 1493. The essence of the Board's current position, as we understand it, is simply that the speculative benefits deriving from its intervention in the electoral process to correct last-minute misrepresentations by the parties do not outweigh the known costs imposed on free

**14.** Consistent with this standard, the Board overturned a previous exception to the *Shopping Kart* rule in *Affiliated Midwest Hospital, Inc.,* 264 NLRB No. 146, 111 LRRM 1425 (1982). It held that it will no longer treat misrepresentations of official Board actions as objectionable conduct unless they involve altered Board documents. Henceforth, misrepresentations of Board action will be treated like any other misrepresentation, and will not serve as a basis for upsetting an election.

choice and majority rule principles by that intervention.

There is considerable analytical and empirical support for this view. In his seminal study of Board election regulation, Professor Derek Bok argued

> [r]ules which purport . . . to permit more rational decisions by the voters are likely to have a more speculative value than one might suppose on first impression. The decision whether to support a union is too often inescapably nonrational, the effects of campaign tactics on the employees too problematical, and the positions of the parties too difficult to compare to permit the administrator to intervene with any real confidence of furthering his objectives except in a limited range of situations.

Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 Harv.L.Rev. 38, 65 (1964).[15]

The initial decision in *Shopping Kart* to abandon scrutiny of most misrepresentations relied also, in part, on an empirical study of 31 election campaigns in 5 states, involving over 1,000 voters. 228 NLRB at 1313.[16] This study indicated that, contrary to Board assumptions underlying the need for *Hollywood Ceramics*-type scrutiny of campaign representations, employee attitudes form strong and stable predispositions to vote for or against union representations, predispositions not easily altered by the representation campaign.[17] The study also demonstrated that employees pay little attention to the content of the campaign.[18] Moreover, the evidence did not show those employees who switched from an undecided or pro-union pre-campaign posture to a company vote were influenced by the content of the company's propaganda; although there was some evidence that employees who switched from an undecided or pro-company intent to a union vote were influenced by the content of the union campaign, the number of employees in this category was too few to matter in many elections.[19] The authors' conclusion, based on this data, provides direct support for the step taken by the Board in *Midland:* "The likelihood that campaign misrepresentations will affect outcome [of elections] is so slim that continued application of the *Hollywood Ceramics* doctrine is more likely to frustrate [employee] free choice than to protect it." Getman and Goldberg, *The Behavioral Assumptions Underlying NLRB Regulation of Campaign Misrepresentations: An Empirical Evaluation,* 28 Stan.L.Rev. 263, 283 (1976).

In light of this evidence, we cannot conclude that the Board's retreat from the *Hollywood Ceramic-General Knit* rule is inconsistent with the statutory design. The Company nevertheless urges that the Board's vacillation with respect to this

---

**15.** Notwithstanding the intrinsic difficulties in such administrative intervention, the Board has largely proceeded on the basis of untested, behavioral assumptions about employee-voters: "The Board itself has based its findings concerning the impact of various campaign tactics largely on its own speculation and has never conducted an empirical study to determine the impact of various campaign techniques on voting behavior." *Harlan # 4 Coal Co. v. NLRB,* 490 F.2d 117, 123 n. 5 (6th Cir.), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). We note that notwithstanding the received administrative and judicial wisdom that wages are the critical issue in campaigns and that representations concerning them must therefore be carefully scrutinized, see note 10, *supra,* numerous studies indicate that the importance of that issue in campaigns has been much exaggerated. See Bok, *supra,* 78 Harv.L. Rev. at 90 n. 148 (citing studies).

**16.** The study was first presented in two law review articles: Getman, Goldberg, and Herman, *NLRB Regulation of Campaign Tactics: The Behavioral Assumptions on Which the Board Regulates,* 27 Stan.L.Rev. 1465 (1975); and Getman and Goldberg, *The Behavioral Assumptions Underlying NLRB Regulation of Campaign Misrepresentations: An Empirical Evaluation,* 28 Stan.L.Rev. 263 (1976). The authors' findings were published in full in Getman, Goldberg and Herman, *Union Representation Elections: Law and Reality* (1976).

**17.** Getman and Goldberg, *supra,* 28 Stan.L.Rev. at 273–75.

**18.** *Id.* at 276–79.

**19.** *Id.* at 279–82.

question—three changes in the standard in a five-year period—undermines the assumption that this standard is a product of the Board's special expertise, and hence any basis for judicial deference. We disagree. The Board conceded in *Midland* that "reasonable, informed individuals can differ, and indeed have differed, in their assessment of the effect of misrepresentations on voters and in their views of the Board's proper role in policing such misrepresentations." 263 NLRB at ——, 110 LRRM at 1492. In this exceedingly difficult area, we are reminded that " '[c]umulative experience' begets understanding and insight by which judgments not objectively demonstrable are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates more than anything else the administrative from the judicial process." *NLRB v. Seven-up Bottling Co.*, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953), *quoted in NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). The current Board has concluded that the previous trial of the *Shopping Kart* rule, a mere 20 months, was an inadequate test and that it should now be given "a reasonable chance to take life." *Midland*, 263 NLRB at —— n. 18, 110 LRRM at 1493 n. 18. Given the intrinsic

difficulty of any administrative intervention to effectuate employee free choice, the empirical support for the path taken here, and the emphasis that the Supreme Court has placed on the experimental nature of the administrative process, we cannot say that the statute does not permit the trial the Board seeks to conduct here.[20]

The Company submits that two pre-*Hollywood Ceramics* decisions of the Former Fifth Circuit, binding on this court under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), indicate that we have enforced a rule against campaign misrepresentations independently of the Board's rule and that we are therefore not bound by the Board's decision to abandon its rule. The cases relied upon, *NLRB v. Trinity Steel Co.*, 214 F.2d 120 (5th Cir. 1954) and *NLRB v. Houston Chronicle Publishing Co.*, 300 F.2d 273 (5th Cir.1962), simply do not indicate that the court applied a standard of review to campaign misrepresentations independent of the Labor Board's. The Board's standards in this area have constantly evolved,[21] and although we have sometimes differed in our application of the then-existent standard to the facts presented (as in the two cited cases), we have never departed from the Board's view of the applicable standard. We do not choose to do so now.

---

**20.** We are not unaware of the criticisms that may legitimately be made of the *Shopping Kart* rule, nor of the scholarly controversy created by the Getman study. One argument is of particular concern: that the elections studied to establish the lack of impact of campaign misrepresentations on employee free choice were conducted under the *Hollywood Ceramics* regime in which such misrepresentations were illegal; that the rule of *Hollywood Ceramics* deters some conduct which would occur absent the prohibition; and that if the legal standard is "almost anything goes," misrepresentations will proliferate and drive out responsible statements. *See* Miller, *The Getman, Goldberg and Herman Questions*, 28 Stan.L.Rev. 1163, 1170 (1976); *Shopping Kart*, 228 NLRB at 1316 (Fanning and Jenkins, dissenting in part). *But see* Goldberg, Getman, and Brett, *Union Representation Elections: Law and Reality: The Authors Respond to the Critics*, 79 Mich.L.Rev. 564, 589 (1981) (only Board remedy currently available, setting aside an election and ordering

a new one, not a substantial deterrent to illegal actions).

The deterrent effect of the *Hollywood Ceramics* rule will surely be tested by its removal in *Midland*. We presume that the Board will continue to monitor elections to ensure that the "surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative." *General Shoe*, 77 NLRB at 126. We further presume that should the *Shopping Kart-Midland* rule prove to be incompatible with the maintenance of these conditions, after it has been given a "reasonable chance to take life," the Board will not hesitate to take corrective action.

**21.** Professor Bok has observed, "Most [election] rules have undergone a continuous process of refinement and change, and some have enjoyed a particularly checkered career, being born in one period, laid to rest in another, only to be resurrected, like the Phoenix, garbed in slightly different plumage." Bok, *supra*, 78 Harv.L.Rev. at 39 (footnote omitted).

The Company urges that, even if we find the *Shopping Kart-Midland* rule applicable, it should not be given retroactive effect in cases pending before the circuit court. We are guided in our resolution of this question by the Supreme Court's statement in *NLRB v. Food Store Employees Union, Local 347,* 417 U.S. 1, 10 n. 10, 94 S.Ct. 2074, 2080 n. 10, 40 L.Ed.2d 612 (1974):

> Appellate courts ordinarily apply the law in effect at the time of the appellate decision, see *Bradley v. School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). However, a court reviewing an agency decision following an intervening change of policy by the agency should remand to permit the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act.

Barring some extraordinary circumstance, this court will not disturb the purely administrative determination that giving retrospective or prospective effect to a policy change best effectuates the purposes of its governing act. In *Optical Workers Union Local 24859 v. NLRB,* 227 F.2d 687, 691 (5th Cir.1955), *cert. denied,* 351 U.S. 963, 76 S.Ct. 1027, 100 L.Ed. 1484 (1956), the court declared:

> [T]he Board has authority to adopt and reverse policy ... in any manner reasonably calculated to carry out its statutory duties .... Therefore, finding, as we do, that the standards adopted by the Board are reasonable, we can discern no valid distinction between a decision made under these criteria and one made under the former unannounced policy. Furthermore, there is no sound reason why standards cannot be applied retroactively, as here, or prospectively, as in *NLRB v. Red Rock Co.,* 5 Cir., 187 F.2d 76 (footnote omitted).

Unlike in *Shopping Kart,* where the Board said nothing about the retroactivity of its new standard other than to apply it to the case before it, the *Midland* Board purported to make this determination when it stated that, in accordance with its usual

practice, its new policy would apply to all pending cases in whatever stage, citing *Deluxe Metal Furniture Co.,* 121 NLRB 995, 1006–07 (1958) and Member Penello's *dissenting* opinion in *Blackman-Uhler Chemical Division-Synalloy Corp.,* 239 NLRB 637, 638–39 (1978). *Midland,* 263 NLRB at —— n. 24, 110 LRRM at 1494 n. 24. The seeming clarity of this statement, however, disappears upon further analysis and we simply cannot discern what effect the Board wishes *Midland* to have on cases pending before the courts. Before reaching the question of the Board's intent, we must consider at the threshold two arguments the Company makes to the effect that the Board is estopped from applying the *Midland* rule retroactively.

The Company first argues that since the Board's official election notice advised employees that misstating important facts was impermissible and might result in the setting aside of the election, the employees would have relied on the Union's statements and were therefore rendered incapable of recognizing union misrepresentations as such. We reject this argument for two reasons. First, neither evidence nor common sense supports the view that employees would suspend their judgment and abandon critical evaluation of the parties' competing claims simply because the Board's announced policy at the time did not tolerate misrepresentations. The election notice contains no guarantee that all campaign statements will be accurate. Second, the argument ignores a fundamental premise of the *Shopping Kart-Midland* rule: that the content of campaign representations exerts little influence on the employees' choice to vote for or against union representation.

The Company also asserts that the fact that the election was a consent election, governed by a stipulation, estops the Board from applying the *Midland* policy retroactively. The stipulation, however, merely governs procedural matters such as a description of the appropriate unit for representation, the time and place of holding the election, etc. *See* 29 C.F.R. § 102.62 (1982).

It does not govern the specific legal rules the Board will use in reviewing election objections. *NLRB v. Granite State Minerals, Inc.,* 674 F.2d 101 (1st Cir.1982), relied upon by the Company, is inapposite: that case involved a Board breach of a material term of the stipulation, viz., that all employees would vote on a specific day in a specific place. Finding that the Board is not estopped from applying *Midland* retroactively to cases pending before the courts, we must attempt to determine whether it intended to do so.

 The statement in *Deluxe Metal Furniture,* cited by the *Midland* Board, that new rules of law should be applied to the case in which the issue arises and "to all pending cases in whatever stage," 121 NLRB at 1007, follows immediately a definition of pending proceedings as "any other case which has not yet been decided, because it has not reached the Board's level or is at one of the other stages of the administrative process such as the hearing." *Id.* at 1006. Although this does not positively exclude retroactive application of new rules to cases pending before the courts of appeals, it clearly offers no support for that proposition. The Board next cites Member Penello's dissent in *Blackman-Uhler* for the idea that the balancing test prescribed by the Supreme Court in *SEC v. Chenery Corp.,* 332 U.S. at 203, 67 S.Ct. at 1581, favors the retroactive application of the *Shopping Kart-Midland* standard, again without specifying whether this applies to cases pending before the courts.

In fact, in *Blackman-Uhler* Member Penello argued in vain that the Board's decision in *Shopping Kart* should be applied to cases pending before the courts. The Board decided *Shopping Kart* during the pendency of the Fourth Circuit's en banc rehearing of *Blackman-Uhler,* and that court remanded the case to the Board to determine the applicability of *Shopping Kart. Blackman-Uhler Chemical Division, Synalloy Corp. v. NLRB,* 561 F.2d 1118 (4th Cir.1977) (en banc). On the same day that it decided in *General Knit* to abandon *Shopping Kart* and return to the *Hollywood Ceramics* stan-

dard, the Board majority declined to apply *Shopping Kart* retroactively in *Blackman-Uhler,* stating only

> The Board ... is of the opinion that it would not effectuate the policies and purposes of the Act to apply *Shopping Kart* in this case. The practice of applying a pronouncement of a new rule of law retroactively, that is, to the case in which it arises and to all pending cases, is traditional and, we believe, the proper course to follow. However, the case before us is one in which the Board has not only decided the representation case but has also rendered a bargaining order under the law as it then existed [*Hollywood Ceramics*]; in these circumstances we decline to reopen this matter which we have finally decided.[6]

[6] Chairman Fanning and Member Jenkins [two of the four-member majority] ... further note that, in *General Knit of California, Inc.,* 239 NLRB 619, issued this day, a majority of the Board has readopted the *Hollywood Ceramics* standard for evaluating campaign misrepresentation.

*Blackman-Uhler,* 239 NLRB 637, 637 & n. 6. Thus, when last presented with the question posed today—whether the less restrictive policy of review for campaign misrepresentations should be applied retroactively to cases pending before a circuit court—the Board answered in the negative on the general ground of administrative finality. We are unable to say if the *Midland* Board, by its general citation to Member Penello's dissent in *Blackman-Uhler* and its discussion of the *Chenery* balancing test for determining retroactivity, intended to reverse the exception to the general rule of retroactivity carved out by *Blackman-Uhler.* Nothing in the *Midland* opinion indicates that the Board was either aware of the exception, or that it intended to overrule or not apply it in *Midland.*

The Union urges us to read *Blackman-Uhler* in light of the Board's simultaneous decision to abandon the *Shopping Kart* rule and return to *Hollywood Ceramics.* They argue that it would have been an exercise in futility to apply an abandoned standard retroactively, and the Board was simply

acting consistently with its policy of applying any intervening change in the law to all pending cases. The difficulty with this position, as is evident from the Board's stated rationale, *supra* at 1057, is that it was not the Board's *ratio decidendi* in the case. Indeed, footnote 6 of the opinion, joined by only two members of the four-person majority, merely notes that *General Knit* issued that day, without drawing any conclusion therefrom or indicating that it altered the majority rationale in any way.

Moreover, in *Purnell's Pride, Inc.,* 265 NLRB No. 146, 112 LRRM 1042 (1982), the Board, confronting an identical situation of two intervening changes in the law with the second change constituting a reversion to the original standard, declined to adopt the approach the Union suggests it took in *Blackman-Uhler.* In *Purnell,* the Board reviewed an election in which it had issued a final order rejecting claims of misrepresentations and ordering the company to bar-. gain. Both the representation case and the unfair labor practice case were decided under the *Shopping Kart* standard. The standard had since changed from *Shopping Kart* to *General Knit* and back again to *Shopping Kart-Midland* when the case was reconsidered by the Board after a successful petition to the Fifth Circuit to withdraw its application for enforcement. The Board did not hold that *General Knit* was *not* to be given retrospective effect because the case had been finally decided by the Board under *Shopping Kart.* Such a holding would have been consistent with the Board's reasoning in *Blackman-Uhler* that it would apply *Hollywood Ceramics* and not give *Shopping Kart* retrospective effect; it thus beclouded the precedential effect of *Blackman-Uhler.*[22] At the same time, it refused to say that it was giving the new standard enunciated in *Midland* retroactive effect, which is the interpretation the Union would have us give to *Blackman-Uhler,* i.e., that the Board was merely giving its decision in *General Knit,* announced the same day, retroactive effect. Instead, in reaffirming its dismissal of the misrepresentation objections, it adopted a third rationale:

> All of the allegations ... on their face allege conduct not objectionable under *Shopping Kart,* which was Board law at the time of the representation and unfair labor practice proceedings and which is presently the law under *Midland National.* However, we do not view this reaffirmation as giving retroactive effect to *Midland National.* Rather, we are merely reaffirming a decision predicated upon the legal standard which was applicable both at the time of the original proceedings and at present. The mere fact that, during an intervening period, the Board adhered to a different standard does not, in our view, provide any sound basis for reopening this matter and applying a different rule.

265 NLRB at ——, 112 LRRM at 1044 (footnote omitted).

In the aftermath of *Purnell's Pride,* we can only conclude that the Board has expressly reserved decision of the question whether *Midland* should be applied retroactively to cases pending before the courts. *Blackman-Uhler* and *Purnell* both involved situations in which the governing standard changed twice during the pendency of the appeal, and the Board's approach varied each time. Unlike *Purnell* and *Blackman-Uhler,* this case involves a situation in

---

**22.** We note that, in an earlier stage of the protracted litigation of *Purnell's Pride,* the company petitioned the Board to reconsider its earlier dismissal of the misrepresentation objections under *Shopping Kart,* since that decision had been overruled by *General Knit* in the interim. The Board had the case on remand from the Fifth Circuit on another ground. *NLRB v. Purnell's Pride, Inc.,* 609 F.2d 1153 (5th Cir. 1980). In an unpublished order, the Board declined "to reopen a matter finally decided," citing its decision in *Blackman-Uhler. Pur-* *nell's Pride, Inc.,* Case 26–CA–6869, slip op. at 2 n. 5 (May 7, 1981). Although the Board's post-*Midland* decision in *Purnell's Pride* does not explicitly overrule this holding, it does not rely on it either. See text at 1058–1059, *infra.* Its reluctance to rely on its unpublished order is understandable since its May 1981 refusal to give *General Knit* retroactive effect flies in the face of its April 1981 decision in *Mosey Manufacturing Co.,* 255 NLRB 552 (1981), giving *General Knit* retroactive effect. See text at 31, *infra.*

which the currently prevailing standard differs from the one that governed the representation and unfair labor practice proceedings. The retroactivity question is thus squarely presented, and we cannot decide it in the first instance.

The Company argues that the Board's present intent not to apply *Midland* retroactively to cases pending before a circuit court may be gleaned from the Board's approval of *Blackman-Uhler* in *Documation, Inc.,* 263 NLRB No. 52, n. 3, 111 LRRM 1588 (1982). This pre-*Purnell* decision, however, merely cites *Blackman-Uhler* for the notion that a new rule of law should be applied retroactively to the case in which it arises and all pending cases, without noting that the opinion purported to carve out an exception for cases pending before the circuit court. Indeed, that issue was not even presented in *Documation,* since the change of law in that case occurred while the decision was pending before the board.

The Union argues that language in *NLRB v. Wagner Electric Corp.,* 586 F.2d 1074, 1077 (5th Cir.1978), to the effect that. *Shopping Kart* could be applied retroactively to cases pending before the courts compels us to give *Midland* retroactive effect today. Since the court upheld the election in question under the more stringent *Hollywood Ceramics* test, this language is pure dictum. Moreover, it is clear that the court in that case did not even seek to determine whether the Board intended *Shopping Kart* to be retroactive in application, as *Food Store Employees Union* commands. Thus, this language is dictum not only in the sense that the retroactivity question was not presented for decision, it is dictum in that the issue was not presented at all.

Finally, the parties cite a number of other contexts in which the Board and courts have confronted the problem of retroactivity of Board policy changes. The difficulty, as the foregoing discussion indicates, is that although the Board does have a general policy that changes in its rules should be applied retroactively to all cases pending in the administrative process, *Deluxe Metal Furniture Company, supra,* it has not enun-

ciated a similar, consistent rule for cases pending before the circuit courts. The closest analogue to the present situation is the Board's treatment of cases on remand from the Fourth and Seventh Circuit Courts of Appeals, respectively, in *Cambridge Wire Cloth Co., Inc.,* 256 NLRB 1135 (1981) and *Mosey Manufacturing Co.,* 255 NLRB 552 (1981), *enforcement denied on other grounds,* 701 F.2d 610 (7th Cir.1983), after its decision in *General Knit* to abandon the *Shopping Kart* rule and return to the *Hollywood Ceramics* standard. *General Knit,* like *Shopping Kart,* was silent on the question of its retroactive application to cases pending before the circuit courts.

Before the Seventh Circuit, counsel for both the company and the Board argued that the new *General Knit* standard should be applied retroactively to cases pending before the courts of appeals. The Seventh Circuit recognized, however, that under *Food Store Employees Union,* it was incumbent upon the Board to make the retroactivity decision in the first instance. It appeared, though, to assume that the agreement of counsel for both sides that *General Knit* should be retroactively applied constituted the Board's decision of the issue; it thus remanded the case so that the Board could retroactively apply the new standard. *NLRB v. Mosey Manufacturing Co.,* 595 F.2d 375, 378 (7th Cir.1979). The Board then applied the new standard retroactively on remand, without addressing the question of retroactivity *vel non* under the *Food Store Employees Union* standard. See *Mosey,* 255 NLRB at 552, 554–55.

In *NLRB v. Cambridge Wire Cloth Co.,* 622 F.2d 1195 (4th Cir.1980), the Fourth Circuit, citing *Food Store Employees Union,* remanded the case to the Board with explicit instructions to "determine the applicability of *General Knit* to the instant case." 622 F.2d at 1200. The Board, instead, construed the court's remand as an instruction to apply the *General Knit* standard retroactively. *Cambridge Wire Cloth Co.,* 256 NLRB at 1142. Thus, although *General Knit* was retroactively applied by the Board to cases pending before two circuit courts,

the Board never explicitly held that it intended *General Knit* to have such effect.

In light of the inconsistency in the Board's decisions dealing with the retroactive application of *Shopping Kart* and *General Knit* to cases pending before the courts, and the confused statement in *Midland,* we cannot determine whether the Board would give *Midland* retroactive effect in this case and thus must remand the case to the Board for decision of that question.

## II. Coercion

■ We turn now to the Company's second objection: that threats against its employees created an atmosphere of fear and coercion that deprived them of free and untrammeled electoral choice. In determining the existence of an atmosphere of fear, this court has employed a three-part test: (1) whether the evidence establishes fear in the minds of the voters; (2) whether that fear affected their votes; and (3) whether, had it not been for the fear, the results of the election might have been different. *Daylight Grocery Co. v. NLRB,* 678 F.2d 905, 909 (11th Cir.1982) (citing *NLRB v. Tampa Crown Distributors,* 272 F.2d 470, 473 (5th Cir.1959)). The objecting party must prove by specific evidence that the election results did not reflect the unimpeded choice of the employees. *Id.*

■ Moreover, activities of a union's employee-adherents which are not attributable to the union itself receive less weight in determining that an election should be set aside. *NLRB v. Southern Metal Service, Inc.,* 606 F.2d 512, 515 (5th Cir.1979). Their coercive conduct or other actions must be "so aggravated that a free expression of choice of representation is impossible." *NLRB v. Monroe Auto Equipment Co.,* 470 F.2d 1329, 1332 (5th Cir.1972) (quot-

ing *Bush Hog, Inc. v. NLRB,* 420 F.2d 1266, 1269 (5th Cir.1969)) (citations omitted), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973).

■ Under this standard, we have no difficulty in affirming the RD's dismissal of this objection without a hearing. The evidence indicated that although one employee, Brown, made statements to two employees that he would shoot them for voting against the union, both employees explicitly stated that they did not take Brown seriously, and one explained that Brown was always teasing. This proof falls far short of establishing an atmosphere of fear and violence sufficient to have had an effect on the employees' free choice. *See NLRB v. Bancroft Manufacturing Co.,* 516 F.2d 436, 444 (5th Cir.1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976).[23]

## III. Payoffs

■ The Board granted the Company a hearing on its third objection, that the Union offered and/or granted benefits to eligible voters, or created the impression it would do so, in exchange for support. The gravamen of the Company's complaint is that widespread rumors of Union vote-buying, coupled with two incidents that might give substance to these rumors, require that the election be set aside. After an evidentiary hearing, the ALJ concluded that neither the rumors nor the incidents were serious and that, even when considered together, they did not raise substantial issues. We affirm this finding.

The Company's evidence concerning rumors of vote-buying was neither clear nor convincing. Two of the three witnesses who testified to pre-election rumors could not clearly distinguish if the conversations overheard related to the gains stemming

**23.** The Company claims that the RD did not consider another threat involving loss of jobs in the event of a strike and violence if employees did not support the union. Assuming without deciding that this claim is properly before us (the Board argues that this was not raised before it and hence was waived), there is no evidence that the so-called threat had any impact on the election whatsoever. The evidence proffered related to a conversation among five employees about the effects of unionization. The speakers made no threats, were not even identified as union supporters, and may simply have been speculating about what would happen if the union won the election. This evidence is simply not probative of an atmosphere of fear and coercion.

from collective bargaining or to union payments for votes. No one testified that the union had anything to do with the rumors, and no witness knew of any individual giving or receiving money for supporting the union. Further, there was no evidence that any employee was influenced by these rumors. Clearly, the rumors alone would not warrant overturning the election. *See NLRB v. S. Prawer & Co.,* 584 F.2d 1099, 1101 & n. 1 (1st Cir.1978); *Federal Electric Corp. v. NLRB,* 539 F.2d 1043, 1044 (5th Cir.1976).

The Company next complains that a known union-adherent displayed a large amount of money in making change for a fellow employee the day before the election, and this bolstered the rumors of vote buying. Examining the circumstances of the incident, the ALJ concluded it was wholly innocuous, and we agree that it adds nothing to the proof that rumors of union vote-buying poisoned the election's atmosphere.

▮ Finally, the Company argues that the action of a union election observer, in repaying debts to two voters in the polling area after they had voted, requires that the election be overturned. The evidence established that the observer, Thomas, repaid small bets he had lost on the Super Bowl to employees Wilkins and Pittman after they voted, the day after payday. He said nothing to Pittman and told Wilkins only that he owed him some money. The Company observer, Price, testified that there were about six or seven employees present each time Thomas made payment. Price stated that these employees were waiting in line to vote about ten feet away from the observers' table, were talking among themselves, and were not paying attention to what the observers were doing. Neither Price nor anyone else could testify that any of these prospective voters actually saw the cash transfers or overheard the brief conversation between Thomas and Wilkins. Thomas and Pittman gave uncontradicted testimony that the payments involved Super Bowl bets, and Wilkins did not testify. The Board, adopting the ALJ's recommendation that the objection be overruled, stated that Thomas' conduct was not to be condoned. It held, though, that Thomas' conduct did not breach the rule of *Milchem, Inc.,* 170 NLRB 362 (1968) and that, under the circumstances, it had no impact upon the election, either when considered by itself or with the other conduct raised under this objection.

The Company's principal contention is that these payments are objectionable regardless of their impact on the election, because of the appearance of impropriety they inevitably create. It relies principally on two cases, *Milchem* and *Modern Hard Chrome Service Co.,* 187 NLRB 82 (1970). In *Milchem,* the Board adopted a prophylactic rule against electioneering in the polling place by parties to an election. Under this rule, conversations between representatives of a party and voters waiting to cast their ballots are objectionable "without inquiry into the nature of the conversations." *Milchem,* 170 NLRB at 362. The Board cautioned, though, that its application of the rule would "be informed by a sense of realism." *Id.* at 363.

Realism, in this context, means that the Board has not allowed the so-called "per se" *Milchem* rule to invalidate elections wholesale. For example, in *Cumberland Nursing & Convalescent Center,* 248 NLRB 322 (1980), the Board rejected without a hearing an employer's objection based on an employee affidavit alleging that a union representative had conversed with employees waiting in line to vote just before or about the time the polls opened. It reasoned that the employer had presented no evidence of the substance or duration of the conversation, and noted: "Although *Milchem* seems to imply that the substance of these [conversations] will not be examined, the Board, in its subsequent applications of *Milchem,* has often relied on the substance of the words spoken as one of the factors in determining whether the conduct in question was objectionable." *Cumberland,* 248 NLRB at 323, n. 8 (citing six cases). This court, in a related context, has held that the Board "should be accorded reasonable latitude in limiting its own rules[,]" *NLRB v.*

*Dobbs Houses, Inc.,* 435 F.2d 704, 705 n. 1 (5th Cir.1970), and the Second Circuit employed an identical rationale in refusing to extend the "metes and bounds of *Milchem* to cover conversations outside the designated polling area." *NLRB v. Newton-New Haven Co.,* 506 F.2d 1035, 1037 (2d Cir. 1974).

The Company insists that, despite the flexibility of the *Milchem* rule, *Modern Hard Chrome Service Co.* requires that this election be set aside. In *Modern Hard Chrome,* an election observer continued to converse at length with prospective voters despite specific warnings by the Board agent not to do so. The observer then offered a waiting voter several dollars when the latter remarked that he would enjoy a beer if he had the money. Under these circumstances, with a self-evident appearance of impropriety, the Board held that *Milchem* applied, stating "[t]he conduct of [the Union's] observer was repeated, despite admonition, and culminated in his gratuitous offer of a loan to a prospective voter. Though perhaps not a crucial fact, a single vote was determinative in this election...." 187 NLRB at 83.

*Modern Hard Chrome Service* does not control this case. The observer's conduct here was inconspicuous, isolated and not in disregard of a Board agent's warnings. Moreover, it did not involve voters waiting to cast their ballots but two who had already voted and happened to be owed money by the election observer. Indeed, the record reflects that the incident went unreported until five days after the election, when a company official questioned a company observer about what he had seen.

We hold, therefore, that the Board was well within its discretion in not extending a *per se* rule to this situation and invalidating the election regardless of its impact. The Company did not even attempt to establish that any prospective voter saw or overheard Thomas paying his debt either time. The evidence demonstrated the incidents were quite brief, and Thomas did not engage in sustained conversation with either employee. Although Thomas' conduct was improp-

er, it did not create an appearance of impropriety because no one saw it. Since per se rules are harsh in their effects, the Board has much latitude in ameliorating them by declining to apply them where conduct is inadvertent and has no demonstrable impact. This was the case here.

Finally, considering the rumors and incidents of objection 3 cumulatively, there is absolutely no evidence that any of these incidents were related or that any employee perceived them as such, or as creating an inference of vote-buying. We affirm the dismissal of this objection.

### IV. Electioneering

The Company's final objection, rejected by the RD without a hearing, is that the Board agent allowed campaigning at or near the polls which destroyed the laboratory conditions necessary for free choice. The election took place in the employee cafeteria, located off a hallway leading from an employee entrance to a production area. The door to the cafeteria-polling area remained open during the election, and the employer complains of the conduct of employees passing through the hallway to and from work.

The evidence indicated that employees on break and during changes of shift passed by the cafeteria, looked in, and that one or two sought to use the vending machines inside. One employee stated that the Board agent prevented this, and another indicated that the Board agent asked a group of people talking loudly outside the cafeteria to leave. A number of employees, as they approached the cafeteria from the hallway, indicated that other employees said to "vote union" or "vote yes" as they entered the cafeteria. Others stated that there was noise and talking in the corridor. A company observer said that some passerby yelled out "yes" and others "no" during a shift change. Only the company observer and one voter stated that they could hear such comments in the voting area itself. The Board affirmed the RD's findings that none of this conduct occurred in the polling area itself, that no statements were made to employees standing in line to vote, and that the evi-

dence did not demonstrate any impairment of employee free choice. We agree with the Board.

Without any evidence of effect on employee free choice, this type of conduct by non-parties does not warrant setting an election aside. The Board's desire to maintain "laboratory conditions" does not mean that it will maintain a perfect environment:

[w]hen the issue is union representation, feelings run strong and deep, and some departures from a perfectly neutral environment must be expected. Consequently, the need for a post-election hearing or a new election is judged not against a standard of perfection, but against the likelihood that the *outcome* of the election might have been affected.

*NLRB v. Klingler Electric Corp.,* 656 F.2d at 89 (emphasis in original); *see Modine Manufacturing Co.,* 203 NLRB 527, 530 (1973). Using hindsight, it seems obvious that it would have been preferable if the Board agent closed the cafeteria door, but this failure neither extended the polling area to the hallway nor warrants the inference that employes were unable to vote freely.[24]

■ The Board's seminal electioneering decision, *Claussen Baking Co.,* 134 NLRB 111 (1961), involved systematic electioneering by an employee, accompanied by the plant operations manager and the sales supervisor, near the polls. The employee talked with several newly-hired employees as they went to vote, electioneering that was highly coercive under the circumstances. Noting that the margin of victory was one lone vote, the Board concluded that the conduct "was of such a nature that it inhibited the exercise of free choice" and therefore set aside the election. *Id.* at 112. The Board has long distinguished between electioneering by the parties at the polling place, see text at 36 *supra,* and non-party electioneering at or near the polls. In the latter case, "the Board makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election." *Glacier Packing Co.,* 210 NLRB 571, 573 n. 5 (1974) (citation omitted). We have upheld the Board's distinction in requiring that non-party electioneering be shown to be destructive of the "atmosphere necessary to the exercise of a free choice in the election." *EDS–IDAB, Inc. v. NLRB,* 666 F.2d 971, 975 (5th Cir. Unit B 1982); *accord, NLRB v. Monroe Auto Equipment Co.,* 470 F.2d at 1332–33. In making this determination, the Board will consider factors such as where the conduct occurred, whether representatives of the parties are present, whether the electioneering is sustained or brief, and whether it is conducted within a designated "no electioneering" zone or against the instructions of the Board agent. *Southeastern Mills, Inc.,* 227 NLRB 57, 58 (1976).

■ The non-party electioneering at issue here appears to have been random, spontaneous and limited to brief remarks. No employee stated that he was confused, distracted, pressured, intimidated or influenced in any way in his voting, and, as indicated above, only one voter stated he even heard these comments while in the voting area. The company observer indicated that the comments were both for and against the union. In the absence of any evidence of influence or intimidation, the Company did not sustain its burden of showing disruption of the election or impairment of free choice. *See NLRB v. Aaron Brothers Corp.,* 563 F.2d 409, 412 (9th Cir.1977); *NLRB v. Golden Age Beverage,* 415 F.2d at 31.[25]

---

**24.** The Board has refrained from interference with the decision of those on the scene: "the establishment of an area in which electioneering is not permitted, must in the first instance be left to the informed judgment of the Regional Director and his agents conducting the election. They are on the scene and familiar with the physical circumstances surrounding the lo-cation of the polls." *Marvil International Security Service, Inc.,* 173 NLRB 1260, 1260 (1968).

**25.** *NLRB v. Carroll Contracting & Ready-Mix, Inc.,* 636 F.2d 111 (5th Cir. Unit B 1981) is not to the contrary. In *Carroll,* two former employees systematically directed propaganda,

In summary, we sustain the Board's dismissal of objections 2, 3 and 4, and remand objection 1 to the Board so that it may decide if *Midland* should be applied retroactively to this case. If so applied, it should dismiss objection 1. If not, it must hold a hearing to determine the validity of that objection.

Enforcement DENIED, case REMANDED.

throughout the polling period, at employees waiting in line to vote. The court found this kind of conduct sufficiently disruptive of the voting and employee free choice to warrant setting the election aside under the standard governing non-party electioneering. Despite the court's citation in this context of *Milchem, Inc.*—which applies only to conversations between parties and voters, *Boston Insulated Wire & Cable Co.*, 259 NLRB 1118, 1119 n. 11 (1982)—it is clear that this circuit upholds the Board's differing standards of review for party and non-party electioneering. *Compare Worley Mills, Inc. v. NLRB*, 685 F.2d 362, 367 n. 3 (10th Cir.1982) (suggesting that the *Carroll* opinion extended *Milchem* to third-party conduct) *with EDS–IDAB, Inc. v. NLRB*, 666 F.2d at 975 (reaffirming the distinction for the Fifth Circuit). Not bound by the more rigid rule of *Milchem*, we find the limited, non-party electioneering here, where the employees were merely en route to the polls, readily distinguishable from that in *Carroll*.