The **STANDARD PRODUCTS CO., ROCKY MOUNT DIVISION,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 86–2605.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1987.

Decided July 23, 1987.

James Howard Daniel, Sr. (Bruce A. Petesch, Haynsworth, Baldwin, Miles, Greaves and Edwards, Greenville, S.C., on brief), for petitioner.

John Elligers, N.L.R.B. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Susan L. Williams, Supervisory Atty., Washington, D.C., on brief), for respondent.

Before RUSSELL and CHAPMAN, Circuit Judges, and KISER, United States District Judge for the Western District of Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

This is an appeal from a consolidated order of the National Labor Relations Board disposing of two proceedings before the Board. The first proceeding related to objections by the Union to an election on the Union's request for representation as the exclusive bargaining agent of the petitioner's employees at its molded weather stripping plant in Rocky Mount, North Carolina; the second arose out of a petition to find various alleged violations of the National Labor Relations Act during a Union organizing campaign at petitioner's plant. The Board sustained the objections by the Union to the election in which the petitioner's employees had voted against the Union's request to be designated as the exclu-

sive bargaining agent for such employees and granted the request of the Union for a new election.[1] It also sustained the Union's charges of violations of the Act and recommended appropriate relief. Included in the charges of alleged violation was the discharge by the petitioner of one Marvin Graham. That discharge was found by the Board to be violative of the Act and reinstatement of Graham was ordered. The petitioner has, by proper petition, requested that enforcement of the Board's order be denied. We affirm in part and reverse in part.

The parties concede that any appeal of that portion of the Board's order which sets aside the election and orders a second election is premature and must await the result of the second election. This appeal, therefore, only concerns the Board's finding of violations of the Act, including the discharge of Graham, and the relief granted because of such violations. Upon consideration of the entire record, we are unable to conclude that the findings of violations of the Act by the petitioner are without a substantial basis in the record *save* in the matter of the discharge of the employee Graham. We are of opinion that Graham was properly discharged and there is no credible evidence in the record that such discharge was "but for" Graham's union membership. We accordingly address the issue of the validity of Graham's discharge.

Whether Graham's discharge was redressable as a violation of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151, *et seq.* (Act) presents what has become one of the more difficult problems in federal labor law. The Act plainly brands a discharge made simply with the intent to discourage or penalize union membership or activity as unlawful and redressable in proceedings before the National Labor Relations Board. But the application of this principle becomes more complicated and complex in the "dual motive" discharge, one in which there is evidence of a bad motive and a good motive for the discharge and one in which the Board and a

reviewing Court must determine which motive was the "but for" cause of the employee's discharge. Graham's discharge presents such a case. The procedure for deciding between the good and bad cause in such a case was most recently stated by us in *NLRB v. Nueva Engineering, Inc.,* 761 F.2d 961, 967 (4th Cir.1985). There we said that

"where an employers' opposition to protected activity is shown to be a substantial or a motivating factor in the decision to take adverse action against an employee, the employer will be found to have violated the Act unless the employer is able to demonstrate that the adverse action would have occurred in the absence of the employee's protected conduct."

In *McLean Trucking Co. v. NLRB,* 719 F.2d 1226, 1227–28 (4th Cir.1983), Judge Murnaghan, addressing the scope of the same rule, said that in this

" 'dual motive' scenario" ... "we require [for enforcement] that 'the evidence must demonstrate why the good motive was not the sole reason for the discharge'.... The Board must articulate, with support in the record, 'an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one.' *Firestone Tire & Rubber Co. v. NLRB,* 539 F.2d 1335, 1337 (4th Cir.1976). If 'an affirmative and persuasive reason' is shown, then it fairly can be said that anti-union animus was 'a factor' in the discharge. If 'an affirmative and persuasive reason' is not articulated and supported, our unbroken practice has been to decline enforcement because, as a reviewing court, we are unable to determine whether the Board *has in fact given due consideration to the record as a whole.*" (Italics added).

Moreover, under our rule in these "dual motive" cases, the General Counsel must "do more than present evidence of union membership in concerted activities where the employer offers a valid reason for employee dismissals. *N.L.R.B. v. Kiawah Island Co. Ltd.,* 650 F.2d 485, 491 (4th Cir.

**1.** At the election, 396 votes were cast by the employees of the petitioner. Of these votes, 122 were in favor of the Union and 249 were cast against it.

1981). When confronted with evidence of a legitimate business motive, the General Counsel must prove by a preponderance of the evidence that union antipathy did actually play a part in the decision to discharge employees." *N.L.R.B. v. Instrument Corp. of America*, 714 F.2d 324, 327 (4th Cir.1983). Moreover, as we declared in *Neptune Water Meter Co. v. N.L.R.B.*, 551 F.2d 568, 570 (4th Cir.1977):

> The rule is that if the employee has behaved badly it won't help him to adhere to the Union, and his employer's anti-union animus is not of controlling importance.

After all, the Act is not a "shield for the incompetent" even though the incompetent seeks immunity under the mantle of union membership or activity. *TRW, Inc. v. N.L.R.B.*, 654 F.2d 307, 312 (5th Cir.1981). In determining whether the Board's decision is supported by substantial evidence, all evidence which might detract from such decision must be fairly considered. *N.L.R.B. v. Gen. Truckdrivers etc.*, 778 F.2d 207, 213 (5th Cir.1985).

While not establishing precedential rules requiring similar findings, it is interesting to note that most of the cases in which the Board has found the discharge in a "dual motive" case violative of the Act involved an employee (1) whose union activities were prominent and (2) whose work record was, if not exceptionally good, not marked by repeated reprimands and an unsatisfactory work record. The resolution of these disputes under the criteria of *Nueva, McLean* and *Wright Line* is, of course, heavily dependent on the facts of each case. An excellent illustration of such a situation is provided by *Instrument Corporation, supra*, 714 F.2d at 326, 329, 330. Five employees were terminated. The employer assigned a reason for the terminations. All the employees terminated had taken an active part in Union organization activities to the knowledge of the employer. Four of them had "unblemished work records"; the fifth, though he had taken "a prominent role in union activities, and knowledge of those activities [could] be imputed to the [employer]," did not have a good work record; he had previously been the subject of a notice of dismissal for "chronic truancy," his attendance at work had been "spotty" and he had had a few days before final termination "a five hour absence from the plant." The termination of the four with the unblemished records was found violative of the Act but the termination of the fifth was found non-redressable under the Act.

Equally apt is *McLean Trucking, supra*, 719 F.2d at 1228, 1229, 1231. Daniels, the employee discharged, "actively and zealously" engaged in union activities. These activities had "earned him the ire" of the employer who had expressed its interests in "getting rid" of Daniels for this reason. But, as the Administrative Law Judge (ALJ) noted in his report, Daniels had proved an "unsatisfactory" employee, often tardy or inexcusably absent from work. This work record was such that the ALJ said that Daniels' "overall work-performance record amply justified his discharge." On appeal, however, the Board entered an order reinstating Daniels, stating that the employer "contend[ed] that Daniels was discharged for 6 years of misconduct. These defenses are clearly afterthoughts." We refused enforcement of the Board's order finding that the Board had not articulated an "affirmative and persuasive reason" why the employer rejected the good cause and chose a bad one.

On the other hand, in practically every "dual-motive" case in which the employer's reason for discharge has been found pretextual and for the "bad reason," the employees involved had had a good work record. That was true of the four employees whose discharge in *Instrument Corporation* was found invalid under the Act. Even more in point is *Nueva Engineering, supra*, 761 F.2d at 968. In that case, the employee, Leach, was "a leading union supporter." The employer was "openly hostile" to the Union and engaged often in condemning the Union to the employees. On one of those occasions, the employer's Foreman "singled out Leach" and warned her about the Union. At another time, the Foreman "explicitly" told Leach that she should work somewhere else because she

was "for all this union business." Several days after this statement Leach was laid off. The justification offered by the employer was two-fold: One was that Leach had refused a promotion and the other was that she was "the highest paid employee" in the department. Both reasons seemed unreasonable and pretextual on their face. Leach had not been told that she was offered a promotion, only that she was to be given a "temporary assignment," an offer she refused. Oddly, the employer claimed in this connection that it had offered Leach the "promotion" because "she was the most capable employee in the department." This could unquestionably have been a valid reason for promoting Leach; it would seem to have been an odd reason indeed for firing her. She received, it is true, the highest salary in the department but it was unlikely this would have been a reason for her discharge "because she was the most capable and able" of the employees in the department. Nor was there any proof that any employee retained "could have efficiently taken over Leach's work, or saved Respondent any money thereby." It is easy to understand the Board's finding that the employer's justification for Leach's layoff was pretextual and that the real reason under the circumstances for the layoff was Leach's active union activity.

*Jeffrey Mfg. Division, Etc. v. N.L.R.B.*, 654 F.2d 944, 948–50 (4th Cir.1981) is another case in which the employee discharged had been actively engaged in the organization of the Union at the employer's plant and the employer knew of the employee's union activities. According to the employer's own witness, the employee "was a good machinist" who "often had an efficiency level above one hundred per cent." He had never been warned about "poor production" and was regarded by the employer as a very good employee. When, however, the employee had been found away from his machine talking to another employee, he was fired because, to quote the employer's contention, "in view of the other warnings [previously written up], the company had no choice except to fire him." The "other warnings" consisted of four written reports of *"unusual conduct"*

that had been allegedly placed in the employee's personnel file. (Italics added). There was no evidence of just what the "unusual conduct" was nor was there any evidence that the employee was ever told of these reports or given any warning about them. The very ambiguity of the phrase "unusual conduct" would suggest that the conduct had nothing to do with the employee's work and was likely related to activities connected with the union organizing campaign. The reason for the discharge was at best weak and the Board's order of reinstatement was properly sustained.

This case has none of the qualities of cases such as *Jeffrey, Instrument,* or *Nueva.* Graham was not a long time employee "with an unblemished work record" as had the four employees reinstated in *Instrument.* By his own statement, he had worked for the petitioner only from January, 1983 to August, 1983, or approximately seven months. His work record during the short period of his employment was characterized even by the ALJ as "marginal." Even that characterization of his work record is, to say the least, forced if not exaggerated. In the short space of his employment, he had been repeatedly warned about his tardiness and unexcused absences. As early as February, he was given a written reprimand, which he acknowledged under his signature, for tardiness and unexcused absences. In this report, it is acknowledged by Graham that "within a ten day period [he was] either tardy and absent three times." The written reprimand included this admonition: "If your attendance doesn't improve more severe disciplinary action will be taken." The record shows that he was absent on May 2, May 16 and 17 and July 26 without having a proper excuse, and had been warned on those occasions and told he had to "improve" his attendance. He was also tardy on June 20, 23, 25, and was given a verbal warning. On June 27 and 29 he was tardy again and was given a written warning. All of these reprimands and warnings occurred before the Union had begun its organization campaign in July or August

1983 with the Company's employees.[2] On June 29 he was suspended for three days. The termination of Graham's employment occurred on August 29.

Graham reported to work on the third shift at about 11 o'clock on August 29. He took a regular break at 2:00 a.m. According to his own testimony he took another break about 4:15 a.m. He said he first went to the bathroom but, feeling tired, he had slipped off to a new portion of the plant where there "wasn't anything in it except boxes" and had taken a nap. His supervisor discovered his absence from his job and, after some time spent in trying to find him, discovered him sleeping over in the new, unoccupied section of the plant. He, along with another employee who was present, awakened Graham. After he had awakened Graham, the supervisor asked Graham didn't he know that sleeping on the job was ground for dismissal. Graham testified that he replied that he knew that sleeping on the job was a dismissable offense. When he attempted to return to his work, his supervisor told him to accompany him to the check-in-check-out clock, where the supervisor, according to Graham, inquired if Graham had gotten his union card back.[3] Graham told him, as he gave his account of the circumstances, he couldn't "get it back." [4] At that point, Graham said that his supervisor "punched [his] card," which Graham understood meant he was fired. The next day, Graham went to see Ferro, the plant manager, and appealed his discharge. Mr. Ferro told him, as Graham recounted it, that "he couldn't reinstate [him] because it would seem unfair to pay me for sleeping on the job while other employees were working."

The contention of the General Counsel was that Graham was fired because he admitted to his supervisor that he had signed a union authorization card and, though he tried, he had not been able to get the card back. There is no explanation of why Graham should have been singled out for this attempt to induce one who had signed a union card to reclaim his card. Graham was not one recognized either for union zealotry or loyalty. Unlike other employees who had actively involved themselves in the union organization campaign such as seeking to induce others to sign authorization cards, Graham could at best be merely identified as one who had simply signed a union card. Nor did he appear to have any feeling of commitment to the union by signing the authorization card. By his own account, he was perfectly willing to withdraw his authorization. He actually testified he tried to withdraw and was only foiled in his endeavor by the fact that his card had already been turned in. There were ample good and compelling reasons for the employer to discharge Graham; there was no evidence in the record that would have suggested why the employer would continue to overlook Graham's delinquencies, even the covert sleeping on the job, and seize on him rather than one of the scores of other employees, many with active involvement in the union organization campaign, for discharge because he had signed a union card if this was the reason for discharging Graham.

The Administrative Law Judge, however, found that the employer in this case had discharged Graham in violation of the Act. He reached this conclusion, even though he said

It is hard to believe that any production oriented manufacturer would not

---

**2.** The ALJ found:

The Union began its campaign among employees at Respondent's Rocky Mount facility in July or August of that year [1983]. During August, the Union held a series of meetings at various motels in the Rocky Mount vicinity in order to introduce itself to Respondent's employees.

**3.** This, according to Graham, referred to a conversation he had had with Bryant earlier. In this connection, Bryant warned Graham he had better get his union authorization card back. Graham, according to his testimony, said he was going to get the card back. Bryant categorically denied any such conversation. The ALJ made no direct finding on this conflict in the testimony.

**4.** This testimony of Graham was categorically denied by Bryant in his testimony.

discharge an employee for slipping off into the far reaches of a plant to nap.[5]

He recognized that Graham was merely a "marginal employee" and had received "a series of reprimands" during his "brief employment." He actually concluded as follows:

> Considering all of the evidence in this case, I am persuaded that *in the absence of Graham's union activities, he would nevertheless have been discharged for his conduct on August 29.* Such a conclusion would ordinarily result in dismissal of the allegation that Graham was discharged in violation of the Act. *Wright Line, A Division of Wright Line, Inc.,* 251 NLRB 1083 (1980). In the instant case, however, I reach a different conclusion for the following reasons. I credit Graham and discredit Bryant with regard to the conversation that took place between them after Bryant found Graham asleep. As I have already noted, Bryant's testimony impressed me as being mechanical and rote, lacking that certain vitality which carries with it trustworthiness. Graham's testimony, on the other hand, evidenced a certain simplicity characteristic of the straightforward truth.

This finding and conclusion of the ALJ was approved and adopted by the Board.

We find that under the ALJ's own findings that any finding that Graham's discharge was violative of the Act cannot stand. As we have observed, we in *Nueva* said that union activity of an employee which had been a substantial or motivating factor in an employee's discharge would be violative *"unless* the employer is able to demonstrate that the adverse action [discharge] would have occurred in the absence of the employee's protected conduct." (Italics added). That is precisely what the ALJ found that the employer in this case had "demonstrate[d]." On that finding, we held in *Nueva* there could be no valid find-

ing of a violation of the Act. And in *McLean Trucking,* on the basis of a finding made by the ALJ that the employee's "overall work performance record amply justified his discharge" we refused to sustain an order of reinstatement of the employee, even though the employer had expressed an interest in "getting rid" of the employee because of his union activity. Under those circumstances we held that the Board had failed to articulate " 'an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one.' " Graham's discharge in no way is analogous to those of either Leach in *Nueva* or of Daniels in *Jeffrey.* Leach, in *Nueva* was very active in the union organization activity and had been warned by the employer about her union activity. But Leach was admittedly "the most capable employee in the department," and the reasons given for her discharge were transparently pretextual and without justification. That case is in striking contrast to the facts here where there are good reasons for discharge, reasons for which "any production oriented [employer] would ... [have] discharge[d] an employee," especially one with the unsatisfactory work record such as Graham's. When the ALJ found that "in the absence of Graham's union activities, he would nevertheless have been discharged for his conduct on August 29 ... dismissal of the allegation that Graham was discharged in violation of the Act" was in order both under the Board's decision in *Wright Line* [6] and under the rule adopted by us consistently in *Nueva, McLean* and other cases.

We accordingly refuse to enforce so much of the Board's order as finds that the discharge of the employee Graham was violative of the Act and as orders Graham's reinstatement with back pay; we do not pass on the order requiring a new election, finding such appeal of that order prema-

---

**5.** The General Counsel sought to make some point of the fact that Bryant had not fired anyone else for sleeping on the job. Bryant, however, had only been the Supervisor since June and had had no occasion to fire anyone prior to that time. Moreover, the employer offered undisputed evidence of at least three other employ-

ees who had been discharged for sleeping on the job. The ALJ improperly refused to consider this testimony.

**6.** *Wright Line, a Division of Wright Line, Inc.,* 251 NLRB 1083 (1980).

ture. Except as stated, the order of the Board is enforced.

ENFORCEMENT DENIED IN PART, ENFORCEMENT GRANTED IN PART.