884 F.2d 1389
 132 L.R.R.M. (BNA) 2240
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
ELION CONCRETE, INC., Respondent.
 No. 88-2196.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1989.
Decided Aug. 16, 1989.
 
 Edward Joseph Gutman (Blum, Yumkas, Mailman, Gutman & Denick, P.A. on brief) for respondent.
 Leizer Zalman Goldsmith (Rosemary M. Collyer, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Barbara A. Atkin, Supervisory Attorney, National Labor Relations Board on brief) for petitioner.
 Before WIDENER and WILKINS, Circuit Judges, and JAMES C. TURK, Chief United States District Judge for the Western District of Virginia, sitting by designation.
 WILKINS, Circuit Judge:
 
 
 1
 The National Labor Relations Board (NLRB) seeks enforcement of its orders in two consolidated cases which found that Elion Concrete, Inc. had violated the National Labor Relations Act, 29 U.S.C.A. Secs. 151, et seq. (West 1973 & Supp.1989). We deny enforcement and remand, in part, for further consideration.
 
 I.
 
 2
 The Act prohibits employers from engaging in unfair labor practices against their employees in retaliation for participating in a labor union or engaging in union-related activities. 29 U.S.C.A. Sec. 158(a). Unfair labor practices include actions which "interfere with, restrain, or coerce employees in the exercise of [guaranteed] rights." 29 U.S.C.A. Sec. 158(a)(1). Also proscribed is discrimination "in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization" and in "discharg[ing] or otherwise discriminat[ing] against an employee because he has filed charges" with the NLRB. 29 U.S.C.A. Secs. 158(a)(3), (4). However, it is not an unfair labor practice for an employer merely to harbor anti-union animus or for anti-union animus to color the attitude of an employer toward a specific employee. See McLean Trucking Co. v. NLRB, 719 F.2d 1226, 1228-29 (4th Cir.1983). An unfair labor practice occurs only when an employer affirmatively acts against an employee or prospective employee because of his or her union activities.
 
 
 3
 Four former employees of Elion, a non-union construction firm located in Baltimore, filed charges with the NLRB alleging that Elion's supervisors and foremen had discriminated against them because of their union activities. An administrative law judge (ALJ) held that Elion had committed unfair labor practices against the four employees. The NLRB affirmed the ALJ's decision and ordered monetary and injunctive relief. The NLRB now seeks enforcement of its order.
 
 
 4
 This court will enforce an NLRB order if it is supported by substantial evidence. 29 U.S.C.A. Sec. 160(e). In a "dual motive" case, where the evidence shows that the employer had both a good motive and a bad motive for its actions, "a reviewing Court must determine which motive was the 'but for' cause" of the employer's actions. Standard Products Co. v. NLRB, 824 F.2d 291, 292 (4th Cir.1987).
 
 II.
 
 5
 The first case before the NLRB was based on charges filed by Muhammad Ibn Hoballah. The NLRB held that Elion violated section 158(a)(4) by refusing to rehire Hoballah in April 1986 as retaliation for his having filed a charge with the NLRB in November 1985. We find that this conclusion is not supported by substantial evidence.
 
 A.
 
 6
 In August 1985 Hoballah was hired by Elion at its St. Paul Street Plaza construction site. He was discharged in October after he engaged in a shouting match with his foreman on behalf of another employee. Hoballah filed an NLRB charge regarding this discharge on November 1. On November 4 Hoballah was rehired at the St. Paul site on the condition that he not intercede in other employees' disputes with management. Hoballah continued to work at the St. Paul site until the project was completed in January 1986 at which time all the non-management employees were terminated.
 
 
 7
 When Elion subsequently contracted to work at the Baltimore Civic Center, supervisor J.L. Parks hired workers at the site in accordance with established policy. When Hoballah visited the site on April 3, 1986, Parks told him that the company did not have any positions presently available, but suggested that he return in two weeks. As Hoballah left the site, he told one or more of the laborers that unless he was rehired he intended to file another charge against Elion. Although Hoballah did not file a second charge at that time, when he returned to the site on April 7 one of the foremen told Hoballah to talk with Parks, whom he said was angry about Hoballah's threat to file another charge. When Hoballah spoke with Parks, Parks told Hoballah that he had heard of Hoballah's threat to file a charge unless he was rehired and that he would never hire him again. On April 9 Hoballah filed a second charge claiming that he was not rehired because of his protected activities.
 
 B.
 
 8
 Although the ALJ found that the October discharge did not violate the Act, he did find that Elion committed an unfair labor practice in violation of section 158(a)(4) by not rehiring Hoballah for the Baltimore Civic Center job. Despite his specific findings that the testimony of both Elion managers and Hoballah lacked credibility, the ALJ found that he could only conclude that Elion did not rehire Hoballah in April due to his filing of the November charge. The ALJ further found that the intent of Elion supervisors to discriminate against Hoballah for filing the November charge "became even more fixed" due to the rumor started by Hoballah that he intended to file another charge unless he was rehired.
 
 
 9
 However, there is no allegation and certainly no finding that Elion hired anyone at or about the time Hoballah was seeking work at the Civic Center site.[1] To the contrary, it is clear that Elion had finished hiring its crew before Hoballah applied. In addition, the ALJ ignored the evidence that Elion rehired Hoballah in November 1985 and continued to employ him until the job was completed. The finding that Elion refused to rehire Hoballah due to lingering resentment over the filing of the earlier charge is not supported by substantial evidence.
 
 
 10
 The evidence shows that until Hoballah issued his ultimatum, Parks intended to rehire Hoballah when a position became available. As threatening to file a charge with the NLRB in a coercive attempt to obtain employment does not constitute protected activity, Elion did not commit an unfair labor practice in deciding not to rehire Hoballah in response to this threat.
 
 III.
 
 11
 The second case before the NLRB was brought on behalf of three Elion employees, Robert Compel, Richard Bergling, and Walter Broll, who were all discharged within a seven-day period in August 1986 at the Towson, Maryland, Sheraton Hotel construction site. The NLRB adopted the ALJ finding that the circumstances of each of these discharges, considered collectively, established that Elion had committed unfair labor practices in violation of section 158(a)(3). The order also adopted the ALJ finding that a separate incident involving an Elion supervisor working temporarily at the site constituted an unfair labor practice in violation of section 158(a)(1). We find that these conclusions are not supported by substantial evidence and deny enforcement. However, we remand for further consideration of whether the evidence regarding the discharge of Broll, standing alone, establishes an unfair labor practice.
 
 A.
 
 12
 Elion commenced construction at the Sheraton Hotel site in late July 1986. Bergling, Compel, and Broll were hired in mid-August. During this time a union representative, Eugene Shanahan, began soliciting Elion employees during their lunch hour at a parking lot across the street from the site. Elion supervisors were aware of Shanahan's activities and occasionally observed their employees talking with him.
 
 
 13
 On August 18 Garland Parks was supervising a small team of workers temporarily assigned to the Sheraton site, but he had no direct authority over Bergling and the other employees regularly employed at the site. During the lunch hour Bergling, carrying union cards, returned from a conversation with Shanahan and joined a friendly discussion with Parks and his crew. When Bergling began to discuss the benefits of joining the union, one of the employees on Parks' crew made a joke about "concrete galoshes," about which everyone laughed. Then Parks, who had worked with Bergling several times over the previous eight years, took a card from him, tore it into pieces, threw the pieces on the ground, and stamped on them. Parks then turned to Shanahan across the street and yelled vulgar insults at him, including a comment about "concrete galoshes." All the Elion employees, including those across the street with Shanahan, laughed at Parks' antics. After this outburst Parks told Bergling that if he wanted to join a union to go ahead and do it. Parks also advised Bergling that he once had been a union member and it did not benefit him.
 
 
 14
 Bergling was discharged on August 26 after he was absent or tardy on several occasions within a two-week period. Although Bergling had been informed when he began working for Elion on August 11 that he was required to notify the site supervisor if he planned to be late or absent from work, Bergling was absent on August 20 and he reported to work late the next day, on both occasions without having notified the site supervisor. When Bergling arrived late on August 21 and inquired whether he still had a job, the supervisor warned Bergling that he had two strikes against him and that he would be discharged on the third strike. On August 26 Bergling notified the site supervisor that he would be late again and asked if he would still have a job when he got there. The supervisor, through his secretary, informed Bergling that he need not report to work because he was discharged. When Bergling arrived late at the work site, he was told that he was discharged.
 
 
 15
 Compel was hired on August 15 and discharged on August 21, one day after he signed a union card. Several days before the discharge, an employee had complained about Compel's slow work and on the day of the discharge, his foreman also confronted Compel about his slow work. In addition, on August 21 Compel refused to comply with a foreman's order to help carry scaffolding and braces, saying, "Well, I am no laborer, I am a carpenter. I do not get paid to tote." The foreman replied, "If that is the case, I do not need you." At the hearing the foreman stated that he discharged Compel for insubordination and, alternatively, because he was a slow worker.
 
 
 16
 Broll was a longtime union member who applied for a job with Elion at the Sheraton site at Shanahan's request. After he was hired on August 13, he spent his daily lunch hour distributing union cards at locations near the job site. Broll testified, however, that to his knowledge no Elion management employee observed him engaging in any union activities. On August 27, during work hours, Broll engaged in a personal conversation with an electrician on the site. Broll claims the conversation lasted for only a minute or two, but his foreman testified that it lasted 20 minutes. Conflicting evidence was presented regarding whether Broll had been previously warned about engaging in lengthy personal discussions with other employees. After the conversation ended, the foreman asked Broll if he had completed an assigned task. Broll admitted that he had not done so and changed the subject of the conversation by inquiring as to the reason for Bergling's discharge the previous day. According to Broll the foreman then replied, "That is it. I am tired of all this union [expletive]. This is a nonunion job and we are not interested in the union. [The supervisor] and I watched you for 20 minutes this morning talking to an electrician." Broll claims that when he denied the allegation, the foreman discharged him. The foreman confirmed Broll's view of the conversation, but reiterated that only after the supervisor had seen Broll talking to the electrician for 20 minutes did the supervisor instruct him to fire Broll.
 
 B.
 
 17
 Despite conflicting testimony and express findings that all parties lacked credibility as to much or all of their testimony, the ALJ ultimately found that the actions of Garland Parks and the discharges of Bergling, Compel, and Broll constituted unfair labor practices. He then ordered Elion to rehire Bergling, Compel, and Broll, even if other employees had to be discharged to open positions for them, and to pay them back wages with interest. The ALJ first concluded that Parks' outburst constituted a threat to Elion employees who might engage in union activities and would tend to coerce employees against engaging in union activities in violation of section 158(a)(1). The ALJ then relied on his finding that Parks' outburst exemplified the strong anti-union feeling of all Elion management in concluding that Compel's discharge three days later was in retaliation for having signed a union card, and thus a violation of section 158(a)(3). The ALJ dismissed the foreman's dual explanations for the discharge, stating that, "[s]uch duplicity can only be explained as an effort to mask the truth." Notwithstanding the undisputed evidence that within a two-week period after beginning his employment with Elion, Bergling was absent for an entire day without prior notice, and late twice, on one occasion without notice, the ALJ concluded that Bergling's supervisor had seized upon his "trivial lateness" on August 26 as a pretext for firing him for his union activities. In reaching this conclusion the ALJ reviewed the attendance records of several other Elion workers to conclude that the supervisor's informal three-strike rule was applied to Bergling in an unduly harsh manner. The records considered by the ALJ did not, however, show how many of those employees' absences from the Sheraton site were caused by a temporary assignment to a different site or were otherwise excused. In addition, the evidence showed that each supervisor had his own informal policy for handling late or absent workers. For example, some supervisors would dock a half-hour or a full hour of pay for any amount of tardiness. At least one supervisor would fire an employee for being late just once. Notwithstanding all this evidence, the ALJ held that the discharge of Bergling was based on his union activities and that, assuming this was a dual motive case, Elion had failed to demonstrate that the supervisor would have applied his three-strike rule against Bergling in the same manner absent his protected union activities.
 
 
 18
 Finally, despite the fact that Broll testified that he believed that Elion was unaware of his extensive union activities and there was no evidence to indicate otherwise, the ALJ found that Elion likely knew of his protected activities and discharged him because of it. This finding was based largely on the fact that Broll was the third union supporter discharged within a week.
 
 IV.
 
 19
 While there is abundant evidence to support the conclusion that Elion management harbors anti-union animus, merely showing that management dislikes union activity does not constitute proof of an unfair labor practice. Parks' act of tearing up one of Bergling's union cards and his accompanying outburst may well have conveyed a restatement of the anti-union animus of Elion management, but since it did not constitute intimidation reasonably tending to discourage union activities, it did not provide a basis to support an unfair labor practice charge. NLRB v. P.B. & S. Chemical Co., 567 F.2d 1263, 1267 (4th Cir.1977). In addition, immediately after his outburst, Parks informed Bergling that he had once belonged to the union and suggested that Bergling join if he thought he could thereby better himself. Bergling obviously was not coerced by Parks' anti-union sentiment since he signed a union card two days after this event. See Pioneer Drilling Co. v. NLRB, 391 F.2d 961, 964 (10th Cir.1968). And, the record is absolutely devoid of any testimony or other evidence that any Elion employee felt intimidated or coerced by Parks' outburst. To the contrary, the evidence is uncontradicted that the employees laughed at Parks' performance. See Certainteed Corp. v. NLRB, 714 F.2d 1042, 1060 (11th Cir.1983). We hold that there is not substantial evidence in the record to support an inference that Parks' outburst interfered with, restrained, or coerced employees in the exercise of their union rights.
 
 
 20
 Further, Elion offered valid reasons for discharging Bergling, Compel, and Broll. Where a company harboring anti-union animus offers a valid reason for discharging an employee, and supports that reason with evidence, the NLRB has the burden of proving "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." Firestone Tire & Rubber Co. v. NLRB, 539 F.2d 1335, 1337 (4th Cir.1976) (citations omitted). See NLRB v. Kiawah Island Co., 650 F.2d 485, 491 (4th Cir.1981). While the NLRB has offered some evidence that Bergling and Compel had union sympathies and that Bergling had even distributed union cards, they were not the only employees who had engaged in such limited union activity. Their union activity therefore cannot fairly be characterized as "prominent," and, unlike in the usual pretext cases, they did not have good work records. See Standard Products, 824 F.2d at 293. We therefore hold that the NLRB has failed to meet its burden of proving that Bergling and Compel were discharged in retaliation for engaging in protected union activities.
 
 
 21
 Broll, on the other hand, was a prominent union activist who had been recruited by the union to seek employment at Elion for the purpose of encouraging union support. The ALJ concluded that the testimony of Elion managers supported a finding that the reason proffered for Broll's firing was pretextual. Although Broll testified that he thought his union activities had been undetected, the ALJ assumed that Elion likely had learned of Broll's affiliation through other channels. The ALJ also relied on the pattern of discharges to support his conclusion that Broll's discharge was an unfair labor practice. Since we have concluded that the evidence cannot support the ALJ's findings that the discharges of Bergling and Compel constituted unfair labor practices, we must remand this case for the NLRB to consider whether Broll's discharge violated section 158(a)(3) independent of the evidence of Bergling's and Compel's discharges.
 
 V.
 
 22
 The petition for enforcement of the NLRB order is denied regarding the failure to rehire Hoballah, the Garland Parks incident, and the discharges of Bergling and Compel. The case is remanded to the NLRB for further consideration of Broll's discharge in accordance with this opinion.
 
 
 23
 ENFORCEMENT DENIED, and REMANDED.
 
 
 
 [1]
 The lack of a vacancy generally is a legitimate justification for refusal to hire an applicant. A complainant is excused from establishing that he applied for a vacant position only where a blatant discriminatory hiring policy made the application futile. See NLRB v. Anchor Rome Mills, Inc., 228 F.2d 775, 780 (5th Cir.1956)