PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TNT LOGISTICS OF NORTH AMERICA,
INCORPORATED,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

No. 04-1131

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

v.

TNT LOGISTICS OF NORTH AMERICA,
INCORPORATED,

*Respondent.*

No. 04-1200

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board.
(12-CA-22309)

Argued: February 4, 2005

Decided: June 24, 2005

Before WILKINSON and WILLIAMS, Circuit Judges,
and Henry F. FLOYD, United States District Judge for the District
of South Carolina, sitting by designation.

Enforcement granted in part and denied in part; remanded by pub-
lished opinion. Judge Wilkinson wrote the opinion, in which Judge
Williams and Judge Floyd joined.

**COUNSEL**

**ARGUED:** James Michael Walters, Atlanta, Georgia, for TNT Logistics of North America, Incorporated. Elizabeth Ann Heaney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board. **ON BRIEF:** Rhonda R. Wilcox, FISHER & PHILLIPS, Atlanta, Georgia, for TNT Logistics of North America, Incorporated. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Julie B. Broido, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

---

**OPINION**

WILKINSON, Circuit Judge:

TNT is a company with a contract to provide delivery services for Home Depot. It discharged one of its drivers after he was involved in three successive mishaps causing property damage. Around the time of the third incident, the employee sent a letter to his supervisors indicating his intent to form a union with his co-workers. The NLRB found that the company committed unfair labor practices by firing the driver and by telling him that the company's contract with Home Depot disallowed unions.

We agree that it was unlawful for TNT to imply that unions were not permitted at one of its locations, but we disagree that TNT violated the NLRA by firing its driver. Given this employee's recent track record of carelessness, we think TNT sufficiently established that it had a legitimate business interest in the driver's termination. Therefore, enforcement of the Board's order will be granted in part and denied in part. We remand so the remedy may be adjusted in accordance with this decision.

I.

TNT Logistics of North America, Inc. ("TNT") is a transportation company that transacts business throughout the East Coast. It has a

contract with several Home Depot stores in Florida to deliver merchandise to the stores' customers.

James Morgan was employed by TNT as a driver. From 1999 to 2001, Morgan worked in TNT's facility in New Castle, Pennsylvania. Drivers at that facility are represented by a union, and Morgan served on the negotiating team of that union while he was there. Morgan also had prior union experience. Before working for TNT, he was employed as a paid union organizer for the Teamsters Union in Youngstown, Ohio.

In the spring of 2001, for personal reasons, Morgan asked TNT to transfer him to one of the company's facilities in Florida. TNT accommodated Morgan's request, and found a job for him in its Cape Coral, Florida, location. The drivers at this location — which has an office inside a Home Depot store — were not represented by a union.

Approximately one year after being transferred to Florida, Morgan was involved in a string of accidents, each requiring TNT to compensate Home Depot for the resulting property damage. These three incidents all occurred within thirty days of each other.

The first mishap occurred on May 17, 2002, when eleven pallets of paving stones fell from Morgan's truck as he was driving on the highway. The loss totaled $924.80. Morgan claims that he was not disciplined for this incident, but admits that he was called in by his supervisor, Patrick Callahan, to discuss what took place. Although Callahan does not recall issuing Morgan a formal warning, he does remember discussing the incident with Morgan "at length" because "the nature of this accident was potentially very harmful" and "actually a pretty ugly ordeal."

The second mishap occurred just five days later. On May 22, 2002, Morgan left several bags of concrete outside at a customer's construction site. A rainfall ruined the concrete, forcing TNT to pay approximately $258 to cover the loss. Morgan says the customer authorized him to leave the concrete at the site, but TNT's company policy provides that any customer authorization of this sort must be written and endorsed with the customer's signature. Although once again Morgan's file contains no warning about this incident, Morgan admits to

being called and questioned about it by Callahan. During that conversation, Callahan recalls specifically admonishing Morgan that "he was wrong" to leave the mortar mix unattended, but he does not remember formally announcing "this is a warning. You've got one more shot."

Finally, the third mishap occurred on the morning of June 14, 2002, when Morgan dropped a birdbath as he tried to load it onto his truck. The birdbath was worth $32. Morgan was not specifically disciplined for this incident, but he was contacted by a supervisor on that day to discuss it.

Around the same time of this third accident, TNT received a letter written by Morgan indicating his "intentions along with other TNT employees to form a union." The letter was dated Wednesday, June 12, 2002, and Morgan says he read it to a co-worker over a two-way radio around that time. Morgan mailed the letter to TNT supervisors on June 13, and he faxed the letter to them on the morning of June 14. TNT manager Allan Tishman says he learned of the birdbath incident on the morning of June 14, but he did not receive Morgan's letter until later that afternoon.

The next Monday, June 17, Tishman e-mailed TNT's labor and employment director, Jack Webb, the following message:

> One of our drivers, James Morgan . . . has had the following cargo claims in the last month. He was issued a verbal warning on 5-27 after the second incident, he had the third on Friday 6-14. Would this be sufficient for termination?

The message then detailed the three incidents described above. Webb responded by asking whether other drivers had been fired for similar occurrences. Apparently satisfied with Tishman's response, Webb recommended firing Morgan.

On June 18, 2002, Patrick Callahan asked to speak to Morgan. Morgan initially responded that he had a right to a lawyer during a disciplinary hearing, but eventually permitted the meeting to proceed. Morgan then threatened to file NLRB charges, explaining "I think this is about union activity." According to Morgan, Callahan responded by

stating, "You know you can't have a union here because TNT has a contract with Home Depot that says that unions are disallowed in the operation and they would lose their contract." When Morgan asked how Callahan knew this, Callahan explained "I didn't read it verbatim but I know that's the policy that they have."

Callahan then walked Morgan to another supervisor's office where Morgan was handed a termination letter. The letter explained that Morgan was being discharged for "unsatisfactory job performance" as determined "[b]ased on the frequency and number of claims" he had been involved in.

Morgan brought unfair labor charges before the NLRB. An ALJ heard the case on April 7, 2003, and issued a decision on May 13, 2003. The ALJ found TNT to be in violation of the National Labor Relations Act ("NLRA" or "the Act"), but he made this decision "[n]otwithstanding [a] concern that Morgan's testimony may have exaggerated his union activity."

On November 28, 2003, the ALJ's decision was largely adopted by the NLRB, which concluded that TNT violated the Act in two different ways. First, it found TNT to be in violation of section 8(a)(1) of the Act for telling Morgan that unions were not allowed due to the company's contract with Home Depot. Second, it determined that TNT violated section 8(a)(1) and (3) of the Act for discharging Morgan because of his protected activities in support of a union. *See* 29 U.S.C. § 158(a) (2000).

The Board's order required that TNT offer Morgan reinstatement and make him whole for any lost earnings. It further ordered the company to "cease and desist from . . . [t]elling employees that it is futile for them to select a union as their collective-bargaining representative," and it required that TNT post a notice to its employees informing them of their right to "[f]orm, join, or assist a union." TNT now appeals.

We review the Board's factual findings to determine if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (2000); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951). *See also Beth Israel Hosp. v.*

*NLRB*, 437 U.S. 483, 501 (1978) (same standard used to review the application of law to facts). "It is not, of course, our job to review de novo the factual determinations of the Board. Still, substantial evidence review is an objective assessment of the sufficiency of the evidence." *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 839 (4th Cir. 2000) (internal citation omitted). Upon making this inquiry, we enforce one of the Board's holdings, but deny enforcement of the other.

II.

The Board concluded that TNT violated section 8(a)(1) of the NLRA which makes it illegal for employers "to interfere with, restrain, or coerce employees in the exercise of" their protected rights under the Act. 29 U.S.C. § 158(a)(1). It based this decision on the ALJ's uncontested finding that Supervisor Callahan told Morgan, "You know you can't have a union here because TNT has a contract with Home Depot that says that unions are disallowed in the operation and they would lose their contract." The ALJ found that since Callahan, a manager, worked in an office inside Home Depot, it is reasonable to assume he knew about the terms of TNT's contract with the store.

Callahan's comments could potentially dissuade TNT employees from seeking to organize a union. The implication was inescapable that if a union was formed, TNT would lose its contract with Home Depot and the drivers would subsequently lose their jobs. As the ALJ noted, this conclusion is "particularly reasonable considering that [TNT] located its offices in Home Depot stores. Should [it] lose its contract with Home Depot, it would in all likelihood lose those offices as well." *TNT Logistics of N. Am.*, 340 N.L.R.B. No. 141, 2003 WL 22855558 at *9 (2003).

We have previously held that an employer commits unfair labor practices when it comments to its employees on the futility of forming a union and threatens job loss at the prospect of union organization. *See Weis Markets, Inc. v. NLRB*, 265 F.3d 239, 243-44 (4th Cir. 2001). We find substantial evidence in the record to support the Board's finding that TNT violated the Act in this way.

### III.

We next address whether TNT violated the Act by firing Morgan. We conclude that it did not.

### A.

Section 8(a)(3) of the NLRA prohibits an employer from engaging in "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). "Because an employer's motives may often be a mix of legitimate and discriminatory reasons, the Board established a procedure in *Wright Line*, to deal with such mixed-motive cases." *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733 (4th Cir. 1998) (citing *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981)).

The *Wright Line* inquiry consists of two steps. "First, the NLRB General Counsel must prove by a preponderance of the evidence that anti-union animus was a substantial or motivating factor in the discharge." *Dorsey Trailers*, 233 F.3d at 839. To meet this burden, the NLRB must show: "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action." *Medeco Sec.*, 142 F.3d at 742.

Once that prima facie case is established, the second step in the *Wright Line* analysis shifts the burden to the employer to prove "that the discharge would have occurred even in the absence of the protected activity." *USF Red Star, Inc. v. NLRB*, 230 F.3d 102, 106 (4th Cir. 2000). "An employer does not violate Section 8(a)(3) when it would have taken the same action for legitimate business reasons." *Dorsey Trailers*, 233 F.3d at 841. However, if "the employer's stated lawful reasons are non-existent or pretextual, the defense fails." *USF Red Star*, 230 F.3d at 106.

### B.

Under the *Wright Line* inquiry, we must first address whether the employee was engaged in protected activity. Employee activity pro-

tected under section 7 of the NLRA includes "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (2000). We recognize that this language is broadly-worded. However, it is not without limits. As we have noted, "[t]he purpose of the act was not to guarantee to employees the right to do as they please." *Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749, 752 (4th Cir. 1949)(internal citation omitted).

Determining whether activity is protected or not depends on a proper identification of the activity's purpose. "[I]t is not the motive of the participants that we are concerned with here but the purpose of the activity." *Id.* at 753. To be protected "the purpose of the concerted activities must be the mutual aid or protection of the employees." *Id.* By contrast, "personal missions are not the sort of concerted activity which the statute protects." *Media Gen. Operations, Inc. v. NLRB*, 394 F.3d 207, 212 (4th Cir. 2005). *See also Blaw-Knox Foundry & Mill Mach. Inc. v. NLRB*, 646 F.2d 113, 116 (4th Cir. 1981).

Moreover, the Act is not meant to be used offensively as a sword — to discourage one's employer from making an impending layoff. The Act instead seeks to provide a shield — to protect employees who wish to band together and engage in concerted activity for their mutual benefit. *See Standard Prods. Co., Rocky Mount Div. v. NLRB*, 824 F.2d 291, 293 (4th Cir. 1987).

Morgan's activity comes very close to blurring this distinction. He engaged in little or no union organizing activity before his string of mishaps. His letter to TNT claimed an intent to negotiate on behalf of many employees. But seen in its full context, his behavior seems to demonstrate "personal and private" goals, unconnected to any purpose "to induce group activity." *See Blaw-Knox Foundry*, 646 F.2d at 116.

Morgan knew first-hand the proper steps to begin a union organizing campaign since he had been a paid union agent earlier in his career. Interestingly, however, many of the usual indicia of such a campaign are absent here. There is no evidence, for example, that

Morgan ever wore union paraphernalia or distributed union literature. In this regard, the ALJ himself expressed reservations:

> Morgan's testimony that he "got serious" about union organizing in late May 2002 warrants careful examination. Typically, in a union organizing campaign, one or more employees will obtain authorization cards from a particular union and then ask other employees to sign them. Union officials and supporters devote considerable time and energy to these solicitations because, to obtain a Board-conducted election, they must demonstrate to the Board that at least 30 percent of the employees in the contemplated unit desire an election.

> Curiously, the present record does not indicate that Morgan asked any employees to sign anything to demonstrate their interest in an election.

*TNT Logistics of N. Am.*, 340 N.L.R.B. No. 141, 2003 WL 22855558 at *6-7 (2003)(internal citation omitted).

To be sure, it is not necessary to obtain signed authorization cards in order to qualify for protection under the NLRA. However, in this case, it is dubious that Morgan's activity was undertaken for the purpose of advancing any group interest when, as the ALJ observed, "the evidence indicates [that Morgan] may have been the only person involved in the organizing drive." Whether there was in fact a genuine organizing drive at all is open to question.

The evidence does suggest, however, that Morgan spoke with other employees about their working conditions and at the very least read his June 12 letter to a co-worker before sending it to his supervisors. In light of this, we shall indulge the generous assumptions mandated by the standard of review in section 10 of the Act, and decline to rest decision on the ground that Morgan's letter-writing was beyond the Act's broad definition of protected concerted activity.

## C.

We do decline to enforce the Board's order with respect to Morgan's termination for another reason. TNT successfully established

that Morgan "would have been fired even in the absence of union activity." *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 523 (4th Cir. 1998). Employers may overcome an unfair labor practice charge by demonstrating "that a worker's deficiencies, economic necessity, or a legitimate business policy compelled" the discharge. *Sam's Club v. NLRB*, 173 F.3d 233, 242-43 (4th Cir. 1999)(citation omitted). TNT made such a showing here.

Morgan was fired because his recent behavior indicated a pattern of negligence that TNT felt it could not afford to ignore. Three instances of carelessness in thirty days is a lot for a company to condone from an employee before taking action to protect itself. Morgan's mishaps go right to the heart of TNT's mission. Home Depot depends on the proper delivery of its products to build customer satisfaction, and TNT must maintain good customer service in order to retain its contract with Home Depot. The fact that Morgan claimed involvement in union activity does not eviscerate TNT's ability to guard against costly liability and protect its legitimate business interests. "After all, the Act is not a shield for the incompetent even though the incompetent seeks immunity under the mantle of union membership or activity." *Standard Prods.* 824 F.2d at 293 (internal citation omitted).

The Board was not convinced by TNT's stated business interests in firing Morgan. It concluded that TNT had impermissibly fired Morgan for his activities in support of the union. In these "dual motive" scenarios — situations where the company has both a legitimate and an illegitimate reason for the employment action — we require that the Board articulate "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." *Standard Prods.*, 824 F.2d at 292 (quoting *Firestone Tire & Rubber Co. v. NLRB*, 539 F.2d 1335, 1337 (4th Cir. 1976)). *See also Pirelli Cable Corp.*, 141 F.3d at 523. For the reasons that follow, we do not think substantial evidence supports the Board's conclusion that TNT's reasons for dismissing Morgan were illegitimate.

First, our case law indicates that "in practically every 'dual-motive' case in which the employer's reason for discharge has been found pretextual and for the 'bad reason,' the employees involved had had a good work record." *Standard Prods.*, 824 F.2d at 293. In the major-

ity of these cases, where the company's stated reason for the firing is rejected, the fired employee's "work record was, if not exceptionally good, not marked by repeated reprimands and an unsatisfactory work record." *Id.*

By contrast, employers who fire workers with significantly flawed records are more often given the benefit of the doubt regarding their proffered reasons. In *NLRB v. Instrument Corp.*, 714 F.2d 324, 329-30 (4th Cir. 1983), we held that the termination of four employees with "unblemished work records" violated the Act, but the termination of a fifth employee — with a checkered work record — did not. Similarly, in *McLean Trucking Co. v. NLRB*, 719 F.2d 1226, 1229 (4th Cir. 1983), we held that the termination of a zealous union advocate was still proper since his "overall work-performance record amply justified his discharge." In light of this pattern, which our precedent has identified, we think the Board erred in discounting the possibility that Morgan was fired for his spotty employment record.

Second, we think the Board erroneously focused on the fact that Morgan's final mistake — the one involving the broken birdbath — cost TNT a mere $32. The ALJ felt it was unlikely that the company would fire a driver over such an insignificant loss, and it therefore concluded that Morgan's termination was "difficult to explain except for the fact that management had become aware of Morgan's union activities right before it decided to discharge him." *TNT Logistics of N. Am.*, 340 N.L.R.B. No. 141, 2003 WL 22855558, at *12 (2003).

To begin with, cost may not be the sole measurement of the seriousness of an incident for the simple reason that customer satisfaction is not always quantifiable. And even if the broken birdbath caused no undue delay in delivery service, TNT was not evaluating the birdbath incident in a vacuum. It was concerned not by the financial loss suffered as a result of any of these three incidents in isolation, but rather by Morgan's emerging pattern of recklessness that this final incident confirmed. Indeed, this third mishap — while concededly much less costly than the other two — was the proverbial straw that broke the camel's back. As Morgan's supervisor, Patrick Callahan, explained, "I believe a year of being safe . . . buys you some more time. . . . But

three in a thirty-day period[,] I have never seen that in my experience with the Company."*

Morgan complains that TNT let the first two incidents pass without consequence to him, and only took action after the third. But a company ought not to be criticized for giving an employee multiple chances, or penalized for having a disciplinary policy that is forgiving in the first or even second instance.

Third, we are troubled by the Board's emphasis on the "suspicious timing" of Morgan's discharge. The Board argues that Morgan was fired immediately after the company learned of his union activity, allowing TNT to "effectively nip[ ] any union activity in the bud." But if this were so, it is hard to explain why TNT would grant Morgan's request to transfer to its Florida location (a location with non-unionized employees), when it was well aware of Morgan's long history as an avid union supporter, including his leadership role for the union at TNT's Pennsylvania facility. Seen in this context, the "suspicious timing" of Morgan's discharge is not suspicious at all, and is well explained by the fact that Morgan was fired on the heels of his involvement in three unfortunate incidents that cost the company more than $1200 within a thirty-day period.

Finally, we disagree with the Board's reliance on the fact that TNT did not conduct a thorough investigation to determine just how much blame should be ascribed to Morgan for each accident. In suggesting that he might not be at fault for these three incidents, Morgan asks that we believe that a driver bears no responsibility for the safe stor-

---

*The parties are in dispute about whether there have been any TNT employees with work records comparable to Morgan's. One possible candidate is Glenn Todd. The Board points out that Todd was not discharged by TNT despite having two incidents in 60 days that caused damage to three pieces of property. As another potential comparator to Morgan, TNT offers Leslie Detlef. Detlef is a former TNT employee who was fired after being involved in four different incidents causing property damage within seven months time. We note that neither candidates' work record mirrors Morgan's history of three mishaps in thirty days, and we are not convinced that either comparison sheds much light on TNT's actions here.

age and transport of his load, that he further bears no responsibility for leaving deliveries exposed to the elements in violation of company policy and in the absence of a customer's authorizing signature, and finally that we disregard the ALJ's own assessment that Morgan's performance at work was anything but commendable. *TNT Logistics of N. Am.*, 340 N.L.R.B. No. 141, 2003 WL 22855558 at *12 (2003).

TNT adheres to a progressive disciplinary policy. This means that typically an oral warning is followed by a written warning which is then followed by termination. But this policy, as TNT explains, is a "discretionary policy" — it is not one that is rigidly inflexible. The Act encourages employees to join labor unions and bargain collectively. "The Act does not require that an employer cease its legitimate business practices or suspend its proper disciplinary prerogatives." *Consolidated Diesel Co. v. NLRB*, 263 F.3d 345, 352 (4th Cir. 2001). While it is true that Morgan's file contained no documentation of warnings, Morgan admits to being contacted by a supervisor after each of the three incidents. When an employee has no less than three conversations of this sort with his boss in such a short time period, we find it hard to believe that he does not understand that his job performance is hardly exemplary.

Here, TNT's entire business depended on reliable deliveries of Home Depot products. It is undisputed that, within thirty days time, eleven pallets of paving stones fell from Morgan's truck onto the highway, several bags of concrete Morgan left outside a customer's construction site were ruined by rain, and a birdbath fell and broke as Morgan was trying to lift it onto his truck. As the ALJ himself recognized, "[i]t cannot be disputed that Morgan had displayed some serious problems." *TNT Logistics of N. Am.*, 340 N.L.R.B. No. 141, 2003 WL 22855558 at *12 (2003). It is altogether admirable for Morgan to have pro-union sympathies, but that does not relieve him of the duty to be a competent employee.

A cautionary note is in order. We emphasize that our decision does not authorize employers to subject employees with pro-union sympathies to any unreasonably demanding standard. But that is not what happened here. In light of Morgan's recent rash of mishaps, and the long-recognized "right of employers to maintain discipline in their establishments," *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798

(1945), we decline to enforce the Board's holding that TNT violated the Act by firing Morgan. The evidence is insufficient to support such a conclusion.

## IV.

   In sum, we enforce the part of the Board's order as it relates to TNT's unfair labor practices through Callahan's comments. But we deny enforcement for the part that relates to TNT's alleged violation of the Act for firing Morgan. On remand, the remedy shall be modified to conform with this decision.

*ENFORCEMENT GRANTED IN PART AND*
*DENIED IN PART; REMANDED*